KATE L. BRUEE, The (CHARD v.). See Case No. 2,614.

---

## Case No. 7,622.

### The KATE TREMAINE.

[5 Ben. 60:[1] 4 Am. Law T. Rep. U. S. Cts. 92; 3 Leg. Gaz. 226.]

District Court, E D. New York. March, 1871.

WHARFAGE—MARITIME LIEN—JURISDICTION.

1. There is a maritime lien upon a domestic vessel for wharfage, which is enforceable in the admiralty.

[Cited in The General Cass. Case No. 5,307. Followed in The Ann Ryan. Id. 428. Cited in Ex parte Easton. 95 U. S. 76; The John M. Welch, Case No. 7,359; The Esteban de Antunano, 31 Fed. 924; The Main, 2 C. C. A. 569, 51 Fed. 956; The Allianca. 56 Fed. 613; The Seguranca, 58 Fed. 910; The Advance, 60 Fed. 767; The Starbuck, 61 Fed. 503.]

2. The jurisdiction of the admiralty depends upon the subject matter alone.

[Cited in The General Cass. Case No. 5,307.]

3. A contract for the wharfage of a canal-boat is a maritime contract.

[Cited in The General Cass. Case No. 5,307; The W. J. Walsh. Id. 17,922; Endner v.

[1] [Reported by Robert D. Benedict, Esq., and here reprinted by permission.]

Greco. 3 Fed. 413; The Wivanhoe, 26 Fed. 928; The Gilbert Knapp. 37 Fed. 213; The Wilmington, 48 Fed. 567.]

4. The maritime law implies a lien on the ship from every lawful contract of the master, made for the benefit of the ship.

5. The rule of the case of The General Smith, 4 Wheat. [17 U. S.] 431, is not one to be extended.

6. A wharfinger is not a material man.

7. Nature of a maritime lien considered.

In admiralty.

BENEDICT, District Judge. This is a proceeding in rem to enforce a lien for wharfage against the canal-boat Kate Tremaine. It is admitted that the vessel in question was employed in transporting freight between the cities of New York, Brooklyn, and Albany, in the state of New York, and Jersey City, in the state of New Jersey. That, in the course of such employment, she was moored at the libellant's wharf, on the Brooklyn side of the East river, and there discharged cargo, whereby the libellant became entitled to the wharfage now sought to be recovered. It is also admitted that the vessel was then owned by a citizen of the state of New York, and was enrolled in that state, and that she has no masts nor sails, nor any motive power of her own.

Upon these admitted facts, the libellant [Kelsey] asks for a decree, while the claimants deny that the vessel became subject to a lien by reason of the facts admitted, and deny the jurisdiction of the court. The amount involved is insignificant, and the action is conceded to have been brought to obtain a decision of this court upon the points of law involved.

The question of admiralty jurisdiction has been so variously treated, and at one time and another determined upon such different grounds, that its constant presentation is not to be wondered at; and when the tenor and scope of the recent decisions of the supreme court upon this subject are considered, no objection can well be made if many cases, supposed to be settled, are now deemed open for re-examination. This condition of the law is doubtless the occasion of the present action.

It is a proceeding in rem, founded upon a contract, which, in view of the well-known usages of navigation, must be presumed to have been made by the master of the vessel, with the assent of the owners, but in their absence. Is the contract such as may be taken cognizance of by a court of admiralty?

In considering this question, we are no longer compelled to determine the extent of the moon's influence upon the waters of New York harbor; nor whether these waters be salt or fresh; nor whether the vessel was engaged in foreign commerce or commerce among the states; nor whether the waters on which she sailed be navigable from the sea

by vessels of ten tons' burthen. A local law of the state is not now a necessary feature. There is no longer any statute of 1845, or any limitation of the act of 1789 [1 Stat. 73], to be considered. All these features, which have sometimes been held to be controlling, are now immaterial. Now, the jurisdiction depends upon the subject matter alone, and we have only to inquire whether the contract in question relates to navigation. If the matter thereof appertains to navigation, it is in law a maritime contract, and no court of admiralty can refuse to adjudicate upon it.

A wharf is a necessity of modern navigation, and of navigation alone. The sole object of its erection is to facilitate the transportation of passengers and freight upon navigable waters. Its form and mode of construction is determined by the element, and its use is always connected with the vessels on that element. "Piers are an incident to the river, and necessary to enjoy it" (Nelson, J., 13 How. Prac. 551)—so necessary, indeed, that, by general law, every vessel has a license to use, for her safety or convenience, any public wharf on navigable waters, upon paying reasonable wharfage. And this use is so much a matter of general concern, that, upon grounds of public policy, the rates of wharfage are usually regulated by statute. The money paid for the aid to the vessel in her business, which she derives from the use of the wharf, is not rent, but wharfage. Nelson, J., Nicoll v. Gardner, 13 Wend. 291. It may become due, although no cargo be discharged from the vessel upon the wharf, or taken from the wharf on board the vessel. It may be chargeable for a vessel not attached to the wharf at all, but only to other vessels which are so attached. The object for which a wharf is erected, the character of the benefits derived from its use—i. e., the safety and convenience of the ship and the nature of the business thereby advanced—seem clearly to characterize the contract of the wharfinger as one appertaining to navigation. It is appurtenant to no other class of business.

Nor is the character of the contract at all changed by the circumstance, here appearing, that the vessel deriving the benefit is without masts or sails, or other motive power of her own. A ship has no motive power of her own. She navigates by the aid of a power outside herself, which she avails herself of, for the most part, by means of her sails. The canal-boat has no sails, but she has her tow-lines, and when thereby she avails herself of the power of a tug, as in the present case, she as really and truly navigates as does the ship, and becomes liable to many of the peculiar vicissitudes which attend a ship.

Such a craft is within the meaning of the phrase "navires et autres batiments de mer," used in the Code de Commerce, which is held to include all craft used for navigation, of whatever tonnage. The character of the vehicle is tested by the employment for which it is intended, rather than by its form or capacity. 1 Bedarride, Com. de Code, bk. 2, p. 63. The word "ship," as used in the act extending the jurisdiction of the English admiralty (12 Vict. c. 10), is declared by the act to include any description of vessels used in navigation, not propelled by oars.

If this were a stationary construction, and incapable of making voyages with passengers or freight, it would be otherwise; but it would be absurd, at this day, to say that the immense business which is now carried on in such boats and barges, is not navigation, because of the form of the vessels used—vessels which, in size, cost, and capacity, as instruments of commerce, far surpass the petty craft out of whose necessities the maritime law originally sprung. See case of The Northern Belle, 9 Wall. [76 U. S.] 526.

Reason and sense, therefore, demand that the contract in question be classed as a maritime contract. This character of the contract is in no wise modified by the circumstance that the rate of wharfage is fixed by law. The same is true of pilotage, and still the character of the contract remains unchanged. [Hobart v. Drogan] 10 Pet. [35 U. S.] 119.

From an early period, wharfage demands have been treated as one class of the well-recognized maritime demands, regulated by maritime codes, and enforced by maritime courts. They were so treated under the regime of the Marine Ordinance—an ordinance which, upon its promulgation, became the common maritime code of the commercial world. The spirit and main features of the Ordinance were perpetuated in the Code de Commerce, in which wharfage was advanced from a place in the 6th class of liens, which was its position under the Ordinance, to a place in the 2d class in order of payment. The reason assigned for the change is, that wharfage is inseparable from the ship, and incurred for the benefit of all interested therein.

Besides these ancient rules, to which we are most properly referred by the supreme court, as affording authority for the decisions of to-day (The Maggie Hammond, 9 Wall. [76 U. S.] 452), there are high modern authorities to the same effect.

The words of the constitution, "all cases of admiralty and maritime jurisdiction," certainly cannot be considered as intending to exclude any cases then acknowledged to be within that jurisdiction, as exercised in the colonies at the time the constitution was framed. The practice of the colonial admiralty courts is consequently authority of a very high character upon such a question. It has been held sufficient by the supreme court. The Belfast, 7 Wall. [74 U. S.] 631.

In the records of the vice-admiralty court of the province of Massachusetts, which included Maine and Nova Scotia, and was, doubtless, the leading province in matters of maritime law, there is to be found, in regular

entry, an action in rem, like the present, to recover wharfage.[2]

So, too, in the early practice of the admiralty courts under the constitution, the same jurisdiction is found to have been exercised. In the case of Gardner v. The New Jersey [Case No. 5,233], the established practice of the court is stated to be generally to refer demands of material men on a domestic vessel to state jurisdictions, if the owner be resident at the place of the contract (see note, 2 Pet. Adm. p. 480), but to allow demands for wharfage. Judge Story, in the case of The Jerusalem, reported as Ex parte Lewis [Case No. 8,310]. at an early day, declared that wharfage accommodations are indispensable for the preservation of the vessel, and, therefore, the wharfinger has a lien, which must necessarily be considered to be a privileged lien. having priority over bottomry. To these must be added the high authority of Judge Ware,—The Phebe [Id. 11,065].—and the case of Johnson v. The M'Donough [Id. 7,395]. and, finally. the authority of the supreme court, in the case of The St. Jago de Cuba. 9 Wheat. [22 U. S.] 418, where wharfage is treated as a maritime demand, and is declared to be "certainly good against all the world."

It must. accordingly, be held. on principle and authority. that the demand in question is maritime in its character, within the meaning of the constitution, and, accordingly, within the jurisdiction of the district courts. The contract being maritime, and made by the master for the advantage and safety of the vessel. it is within the rule of the maritime law, which implies a lien upon the ship from every lawful contract of the master, made for the benefit of the ship. I know of no principle of the maritime law which will permit. nor any binding authority which should compel me to deny a lien to such a creditor as the present. Certainly. if a lien be given to any one dealing with the vessel, it should be to the wharfinger, for. under ordinary circumstances. he has no option, but must render the service, because the law gives a license to the vessel to use the wharf. In such a case common justice requires it. And so is the weight of authority. The Maritime Codes and decided cases, already cited. all recognize the existence of the lien. In the case of The St. Jago de Cuba [supra], the supreme court expressly recognized it, and hold a payment on account to be appropriated to this item. because it carried a lien.

It is said. however, that this is a domestic vessel. So was the St. Jago de Cuba; and my researches. so far as I have been able to extend them. have failed to discover. in the maritime law, any general distinction between foreign and domestic vessels. in re-

spect to demands like this. No such distinction appears in the Consulato del Mare, which was not a local enactment, but a declaration of the maritime law, as then recognized by all maritime nations. The Marine Ordinance made no such distinction, nor did the Code de Commerce. Even the English common law courts conceded that, by the maritime law, a lien followed every contract of the master, made for the benefit of the ship. The same result has attended the research of counsel of our own day, learned in the law. O'Connor's Argument [in People's Ferry Co. v. Beers] 20 How. [61 U. S.] 394. See. also. Woodbury. J., in Waring v. Clark, 5 How. [46 U. S.] 475.

In cases of tort. of damage arising from the negligence of the master. which the owners cannot prevent, no such distinction has ever been made. There the liability of the owner, and of the ship, are declared convertible terms. The China, 7 Wall. [74 U. S.] 66. Why is there not the same rule in cases of contracts of the master, to which the owners assent?

But the case of the General Smith [supra]. and cases which have followed it. are cited. The results which have attended the doctrine declared in the case of The General Smith, will. I judge. be conceded not to have been sufficiently beneficial to call for any extension of the rule of that case. It has given rise to numerous attempts to create state admiralty proceedings, framed for no other purpose than to avoid its effect, and which have proved to be snares. See The Circassian. Case No. 2,721, note. Taken in connection with other subsequent cases. it has compelled the decision. that a maritime lien may exist without any right to a proceeding in rem. Francis v. The Harrison [Case No. 5,-038] Hoffman. J., Sept. 26, 1870. It declares an exceptional doctrine. which is at war with all the analogies of the maritime law. and which has been continually assailed as without support in authority, and without foundation in reason. and which, I think, must in fairness be said to have failed to secure a resting-place in the maritime law of America. It belongs elsewhere, for the maritime law deals not with local laws. "The truth is. that the admiralty and maritime jurisdiction of the courts of the United States given by the constitution. covers not merely the cognizance of the case. but the jurisprudence and principles by which it is to be administered. It covers the whole maritime law applicable to the case in judgment. without the slightest dependence upon or connection with the local jurisprudence of the state on the same subject." Story. J.. The Chusan [Case No. 2,717]. See. also. Pardessus, preliminary chapter. p. 4. Says Judge Woodbury (Waring v. Clarke. 5 How. [46 U. S.] 475): "The civil law gives a lien on domestic vessels. but the supreme court has not felt justified in doing so without a statute. because not done in England." And. according

---

2 For the fact here stated I am indebted to an argument upon the question of admiralty jurisdiction. over a contract of insurance. prepared and submitted to the supreme court, by F. C. Loring, Esq., of Boston.

to Dr. Bell (1 Bell, Comm. 527), the rule was a deviation in England from the maritime rule prevailing in other nations, which proceeded rather from peculiar notions of jurisdiction than from any general principles of law or experience.

These peculiar notions of jurisdiction have at last been expelled from the jurisprudence of America, and the opinion is widely expressed, that their offspring should follow them. The courts will then be relieved from the necessity of holding that the residence of the ship owner, which is considered immaterial as affecting the master's contracts of affreightment, or his contracts with the tug, or the pilot, or the crew, becomes all at once very material, when his contract is for the food of the master, pilot and crew; and it will then no longer be necessary judicially to declare that the New York owner, if he conclude to sleep and vote in Jersey City, thereby transforms his vessel to a foreign ship. Certainly, it is no time to extend such a doctrine.

Thus far, this doctrine has been applied by the supreme court, only to the contracts of material men. The present is not the case of a material man, but of a wharfinger. A wharfinger is not a material man. His demand is of a different character, and is given a different rank in the order of payment. This has been several times adjudged. Secor v. The Highlander [Case No. 12,604]; Davis v. Child [Id. 3,628]; Russel v. The Asa R. Swift [Id. 12,144]. The supreme court, in passing upon the demand of Despreux, in the case of The St. Jago de Cuba, adjudicated upon a claim for wharfage as differing from the claim of a material man.

I therefore conclude that, according to the maritime law, an implied lien upon this vessel was created by the contract of the master with the wharfinger, and the contract being maritime, the right to a proceeding in rem follows of course. Davis v. Child [supra]. A lien being implied by law, it is regarded as in effect an element of the original contract (The Maggie Hammond, 9 Wall. [76 U. S.] 450), and it must be admitted, that when such a lien exists, a proceeding in rem may be had. Harmer v. Bell, The Bold Buccleugh, 7 Moore, P. C. 269. The sole object of a proceeding in rem, is to give effect to a maritime lien. Beane v. The Mayurka [Case No. 1,175]. It is a proceeding peculiar in character, and having effects not attainable by any other form of proceeding. The Young Mechanic [Id. 18,180]. It cannot be truly said to be simply a remedy, but becomes part of the contract—a substantial right—of which, if a party be deprived, he in effect loses his lien.

A maritime lien is a jus in re. It is an appropriation of the thing, made by the law, to the end that debts of a certain class be always secured. It is not a security collateral to the liability of the owner, but a special property in the ship, which practically can be realized in no other way than by a proceeding in rem against the ship; and the liability of the ship was originally the primary liability, the liability of the owner being merely incidental to his ownership. The Phebe [Id. 11,066]. This special property, when once acquired, it has been held not competent for a court to impair or take away. The Feronia, 17 Law T. [N. S.] 622.

Says the supreme court, "The contract being maritime, over which admiralty courts have jurisdiction, consequently, either party may, in a proper case, enforce his lien by a proceeding in rem." The Eddy, 5 Wall. [72 U. S.] 494.

The lien and the proceeding are spoken of as one thing in the case of The St. Lawrence, 1 Black [66 U. S.] 522. I know of but a single instance, in which, as it may perhaps be said, the right to a proceeding in rem has been cut off by statute from a maritime lien. That is, the act of July 20, 1846 (9 Stat. 38), which forbids a libel against a canal-boat for wages, and by strong implication admits the liability of such vessels, in the absence of a statute, to be proceeded against in rem upon their maritime contracts.

Inasmuch as the wharfinger is not within the designation of a material man, of course the 12th admiralty rule of the supreme court as amended is not applicable here. That, by its terms, related only to material men. If this were not so, it might be difficult to uphold the rule as valid in a case like this. Assuming the correctness of my position that, by the maritime law, the libellant has a lien on this vessel, and a consequent right to a proceeding in rem, it might be doubted whether the power to deprive him of that right by rule was conferred by the acts under which the admiralty rules are promulgated. Those acts confer only the power to regulate forms and modes of proceeding.

The principles, rules and usages which belong to courts of admiralty, as contradistinguished from courts of law, are preserved to the courts of admiralty by the act, except as may be provided by congress, subject to regulation only by the supreme court, not to destruction. Can a regulation of process forbid a proceeding in rem? Can such a proceeding in any cause of damages, or of subtraction of wages, be forbidden by a regulation of process? In the absence of any prohibitory statute, no rule of court could, in my opinion, destroy the right of this libellant to his proceeding in rem against the vessel, for this demand.

I have thus far treated this proceeding as resting solely upon the lien given by the general maritime law; but cases of this class present another aspect. By the law of the state of New York, where this contract was made, it is provided, that a lien upon a ship shall exist, whenever a debt shall be contracted for the wharfage of the ship. And a question is suggested as to the effect of such a statute. On the one side, it is said, the statute of the state, if it have any legal

effect, attached a lien to a maritime contract. If that be so, it creates a maritime lien. No jus in re attached to a maritime contract can be other than a maritime lien—and such the liens on ships, attached by state laws, have been held to be. The Young Mechanic [Case No. 18,180]; The Hull of a New Ship [Id. 6.859]. But a state statute of that nature is void. "State legislatures have no authority to create a maritime lien." The Belfast, 7 Wall. [74 U. S.] 644; Moir v. The Dubuque [Case No. 9,696].

On the other hand, it is said, if by the law of the place where this contract was made, a security was created, by force of the law, it became part of the contract. Therefore, it must travel with the contract wherever it shall be enforced. The contract may be lawfully enforced in this court, and this court cannot sever from it the security on which the creditor relied under the law. "If the cause is a maritime cause, subject to admiralty cognizance, jurisdiction is complete over the person as well as the ship. It must in its nature be complete, for it cannot be confined to one of the remedies on the contract, when the contract itself is within its cognizance." New Jersey Steam-Nav. Co. v. Merchants' Bank, 6 How. [47 U. S.] 392, Nelson, J. To say, then, that in this court the lien cannot be enforced, is to say, that a state cannot attach a lien to a maritime contract. But such a power has already been conceded by the supreme court, down to the case of The Belfast, 7 Wall. [74 U. S.] 633, and, as it is further argued, if the state statute be valid for this purpose, its legal effect cannot be nullified in this court for reasons of expediency. If the lien be lawfully attached to the contract, the contract cannot be mutilated by a refusal of process. Such must be the effect of a denial of process in rem in a court of admiralty, for as between the creditor and the vessel the process in rem is the only possible method of deriving any benefit of the lien.

Is it competent, by rule. to destroy a lien which has its origin in the law? These and other kindred questions are avoided in this case, by treating it as a case in admiralty, dependent upon the rules of the maritime law, of which cases Chief Justice Marshall has said: "A case in admiralty does not, in fact. arise under the constitution and laws of the United States. These cases are as old as navigation itself, and the law, admiralty and maritime, as it has existed for ages, is applied by our courts to the cases as they arise."

In conclusion, I have only to add that I have given to this case full consideration, not only because of the importance, in many aspects, of the questions involved, but because the conclusion to which I have arrived is different from that announced by more than one judge of experience and ability in similar cases which have formerly arisen in this harbor. Since those decisions,

great changes in the law have taken place, and I am satisfied that the decision which I am about to render, is more in harmony with the weight of authority and with the principles of maritime law as now understood. A decree will accordingly be entered in favor of the libellant, but without costs. See Brookman v. Hamill, 43 N. Y. 554.