## THE WILMINGTON.

### WOOD v. THE WILMINGTON.

#### (District Court, D. Maryland. October 25, 1880.)

1. ADMIRALTY—MARITIME CONTRACT—CHARTER OF CANAL-BOAT FOR USE IN HARBOR.
   A person engaged in the business of furnishing to the grain elevators in the port of Baltimore barges suitable for carrying grain to be used principally for storage when the elevators were full, and incidentally to carry the grain to ships loading in the harbor, chartered a canal-boat for 60 days, agreeing to pay for the first calking thereof, the master thereafter to keep her in thorough repair, and to man and furnish her with all appliances. The purpose for which she was to be used was understood by both parties, but was not expressed in the charter-party. *Held*, that this was a maritime contract.

2. SAME—STIPULATION FOR CONTROL—LIABILITY IN REM.
   Notwithstanding that the charterer had control of the boat for the period of the contract, the boat was liable *in rem* to him for an injury to the cargo caused by the master's failure to keep her in thorough repair.

3. SAME—LEAKING—EVIDENCE OF UNSEAWORTHINESS.
   Before the boat was used, her deck was recalked at the charterer's expense, which the master said was all the repairs she needed. After a short period of use, she was found to be leaky, and rejected, whereupon the master took her away, had her repaired, and brought her back, saying he had found the leak, and fixed it. She was again loaded, and shortly after sprung a leak which caused an injury to the cargo. She was then taken to a dry-dock, where the oakum was found to be out of her seams in several places. *Held* sufficient to show that the injury was due to a breach of the agreement to keep her in thorough repair, and she was therefore liable for the damages.

In Admiralty. Libel by John Wood against the canal-boat Wilmington.

MORRIS, J. The libelant, Wood, made a contract for the use of the canal-boat Wilmington, which is as follows:

#### "CHARTER-PARTY.

"I, John Wood, on this 19th day of July, 1880, charter from Dominick Magrudy the boat known and called the Wilmington, (of which the said Magrudy is master and owner,) for the term of sixty days from date. The said John Wood agrees to pay the said Magrudy the sum of two hundred and fifty dollars for the above-named sixty days. The said John Wood agrees to pay for the first calking of the said boat, after which the said Magrudy agrees to keep said boat in thorough repair, and to man and furnish her with all appurtenances."

The testimony shows that the libelant's well-known business was to furnish to the grain elevators in the port of Baltimore barges suitable for carrying grain, which they needed when the elevators were full, and which they used principally for storage, and incidentally to carry the grain to ships which they desired to load in different parts of the harbor. This was the purpose for which the barge was to be used in the present case, and was well understood by both parties. The owner of the barge lived in Philadelphia; but the master of the barge, who had brought her to Baltimore, had authority to make the contract. Under this contract her deck was recalked at the libelant's expense, which the master said was all the repairs she required. She then was twice loaded with

grain, which she carried across the harbor and discharged into steamships. Then she was loaded at one of the elevators, and lay about 10 days, when she began to leak. The grain was taken out of her, uninjured; and her master was told she would not answer, as she was too leaky to carry grain. The master then took her away, had repairs put upon her, and brought her back, saying to libelant that he had found the leak, and fixed it, and now the boat was all right. She was again loaded at one of the elevators, and moved near to another, and there lay eight days, when she sprung a leak in the night-time and damaged her cargo very considerably. It is for this damage, which the libelant had to make good to the elevator company, that he brings this libel against the barge.

After the grain was taken out of her, the master had her hauled on the dry-dock for repairs, when it was found that the oakum was out of her seams in half a dozen places, and he was obliged to have her entirely recalked and repaired. By the contract it was agreed by the master that the boat should be kept in thorough repair; and, from all the testimony, I have no difficulty in finding that the damage resulted from a breach of this agreement. Although the contract recites that Dominick Magrudy was master and owner, he was in truth master only, and Mrs. Ann Magrudy, of Philadelphia, was the owner. She makes claim to the boat; and, besides defenses to the merits and facts of libelant's claim, she denies the jurisdiction of this court to take cognizance of the case, and denies the libelant's right to maintain a proceeding *in rem.* It is now, however, I think, quite well settled that canal-boats, lighters, barges, floating elevators, and similar floating contrivances, used in harbors as instruments of commerce, are, in like manner as sea-going vessels, subjects of admiralty jurisdiction, and that contracts with regard to their employment and repair are maritime contracts, and matters of admiralty cognizance. *The Kate Tremaine*, 5 Ben. 60; *The W. J. Walsh*, Id. 72; *The E. M. McChesney*, 8 Ben. 150; *The Floating Elevator Hezekiah Baldwin*, Id. 556; *The Northern Belle*, 9 Wall. 526; *Edner* v. *Greco*, 3 Fed. Rep. 411. Under the contract in this case, the canal-boat could have been used for any of the purposes for which such a vessel is suitable; and she was in fact used in two instances to carry grain across the harbor. The fact that the principal use to which it was expected she would be put, and for which she actually was used, was to hold grain on storage until the elevators were relieved, does not, in my judgment, alter the rights of the parties. In *Reppert* v. *Robinson*, Taney, 498, it is said:

"The manner in which the vessel is actually employed cannot affect the question of jurisdiction. It depends upon her character. If the repairs fitted her for navigation of the sea, the contract was maritime; and it does not rest with the owner to confer or take away admiralty jurisdiction at his pleasure by the mode or trade in which he afterwards employed her."

The objection to the libel most strongly urged is to its character as a libel *in rem.* It is urged that a contract such as the present one makes the libelant the owner of the boat during the term of the contract; that

she was hired to him absolutely for 60 days; that he was to have complete control, possession, and command of her; and that, as under such a contract the owner would have no lien on the cargo for the hire, the charterer should have no lien on the vessel for damages resulting from her unseaworthiness, or other breach of the charter by the owner. That where the charterers have the possession and control of the vessel the owners have no lien for their hire, is indeed settled. *Drinkwater* v. *The Brig Spartan*, 1 Ware, 149. The parties in such case have voluntarily entered into a contract, the effect of which is held to be to remit the owner to the personal responsibility of the charterer. The charterers have a lien on the cargo, and to allow a lien to the owner, also, might be to endanger the property of innocent shippers, having no notice of the contract. But the rule of the general maritime law is that every contract made by the master, within the scope of his authority, binds the vessel, and gives the creditor a lien on it for his security. *The Phebe*, 1 Ware, 271; *The Paragon*, Id. 322. And the exceptions to this rule are not to be extended unless for imperative reasons. There is high authority for saying that even where the whole vessel is demised, or let to hire, a shipper may have a lien on the vessel. In *The Phebe* it was held that the shipper might proceed against the vessel notwithstanding she was let to a hirer who was to have sole control of her, and notwithstanding the shipper would have no remedy *in personam* against the owner. *The Phebe*, 1 Ware, 271; *The William & Emmeline*, Blatch. & H. 71; *The Freeman*, 18 How. 182. I can see no sound reason why the present case should be held to be an exception to that general rule, inherent in the maritime law, by which whoever deals with the master, within the scope of his authority, is entitled to look to the ship as his security; and I have been referred to no case which so decides.

In this case the master knew better than any one the age and condition of his boat, and her fitness to carry grain without injuring it. He undertook to have the repairing done to make her fit after she had once sprung a leak. He was to remain on board of her, to watch her and her cargo, and keep her wells free of water. He had expressly stipulated with the libelant to keep her in thorough repair, and I fail to see why the boat should not be held liable *in rem* to the libelant for damages to a cargo resulting from a breach of this stipulation, which cargo the libelant, relying on this stipulation, had procured for her, and which damage he was answerable for, and has paid.

Upon the theory that this was an absolute demise of the boat, and that the master was in the employment of the charterer, and not of the owner, it is contended that the owner is not responsible for the neglect and defaults of the master in allowing the leak to get such headway as to injure the grain. But the master, who was offered as a witness by the respondents, and not by the libelant, denies that he was negligent, and declares that he was constantly on board, diligently attentive, morning and evening, to pumping the boat, and states that, when the leak started, it gained so rapidly that no exertions could stop its gaining. Therefore, even though he is regarded as the servant of the libelant, the respond-

ents' testimony acquits him of fault. There is no contention, however, but that when the master made the contract, and stipulated to keep the boat in thorough repair, he was acting on behalf of the owner, and within the scope of his authority, and also that he was so acting when, the boat having been once rejected as leaky, he took her to be repaired, and subsequently returned her, saying she was all right, and ready for loading. The owners of barges to be used for grain have been held by the admiralty courts very strictly to the duty of keeping their boats tight, strong, and in every way fit for the purpose for which they are used; that is to say, so that the water shall not reach the grain. The supreme court has said that, if they are incapable of this, they are not seaworthy, and that there is no other test. *The Northern Belle*, 9 Wall. 526; *Kellogg v. Packet Co.*, 3 Biss. 496. In this case the whole purpose and meaning of the stipulation that the owner should keep the boat in thorough repair was nothing more nor less than that, while subjected to only the ordinary risks of her employment, she should not so leak as to injure her cargo.

I pronounce in favor of the libelant; but, as the testimony with regard to the loss on the wet grain was not entirely satisfactory, unless the parties can agree on the amount, I will send the case to a master to compute the damages. I think it should be shown, with more accuracy than was done at the hearing, how much the grain which was wet was depreciated in value.