McNeely and Price Company et al. *v.* Philadelphia Piers, Inc., et al.

Argued October 4, 1937

Before KEPHART, C. J., SCHAFFER, MAXEY, DREW, LINN, STERN and BARNES, JJ.

*Edwin J. McDermott,* with him *Philip F. Newman,* for plaintiff.

*Edward Knuff,* with him *Herbert S. Levy,* for intervening plaintiff, Pennsylvania Public Utility Commission.

*Wm. A. Schnader,* with him *J. F. Shrader, H. Merle Mulloy, Charles Myers, Windsor F. Cousins* and *Francis R. Cross,* for defendants.

*G. Coe Farrier* and with him *Herman N. Schwartz,* Assistant City Solicitors, and *Joseph Sharfsin,* City Solicitor, for appellant (Appeal, No. 244).

OPINION BY MR. JUSTICE MAXEY, January 24, 1938:

This case is before us on original jurisdiction upon a special certiorari directed to the court below, removing the record to this court, and the matter is now before us for consideration after argument on the amended bill in equity and preliminary objections thereto filed by defendants. The case was argued jointly with the associated case of *Philadelphia Piers, Inc., v. McCaughn,* 329 Pa. 147, 196 A. 861, on an appeal in the latter case from a decree granting a preliminary injunction. The facts in the two cases are closely interrelated and we

will refer to them here, inasmuch as the determination here reached eliminates the necessity for consideration, in deciding the other case, of the questions of law there involved.

Defendants are respectively a wharfage company and three railroads. The railroads are common carriers engaged in the transportation of freight and passengers in interstate commerce, and likewise in the operation and maintenance of pier and wharf facilities on the Delaware River in the City of Philadelphia. The Reading Company and the Pennsylvania Railroad Company own and operate their own wharves. The Baltimore and Ohio leases its wharf from the City of Philadelphia, but operates it in exactly the same manner as the two other railroads. The fourth defendant, Philadelphia Piers, Inc., leases its wharf from the United States Government, but operates it in a similar manner. Its wharf is served by certain lines of the defendant railway companies. Over all the wharves and piers of defendants pass import and export freight between ocean-going vessels on the one hand, which dock at the piers, and railroad cars and other forms of land transportation, which deliver or receive the merchandise at the wharves. The merchandise is consigned by water carrier to and from foreign countries, as well as in interstate commerce. Where freight is delivered to or transported from the piers by rail, compensation for use of the railroad defendants' wharves is included in the tariffs charged by the railroad companies. In the case of Philadelphia Piers, Inc., where a railroad serves the incoming or outgoing freight, this defendant receives compensation for the use of its pier from the railroad concerned, which is absorbed by that railroad in its carriage charges to the consignor. Where the freight is delivered to or received from other carriers or forms of land transportation, defendants, up to the inception of these proceedings, received no compensation for the use of their piers.

A short time prior to 1937, defendants gave notice that, beginning February 1, 1937, a top wharfage charge of 50 cents per ton would be levied on freight moving across their piers to or from ocean-going vessels shipped in foreign commerce, where such freight was not delivered to or transported from the piers by rail carrier. Top wharfage is a charge levied upon the owners of merchandise for the privilege of using the pier or wharf, in transferring the freight to and from vessels docking there, or of having their goods lie upon the dock in the course of loading and unloading operations.

This notice meant that where freight moved to or from the wharves by rail, no wharfage fee was charged, this being absorbed in the rail rates. But if rail transportation was not involved, defendants announced their intention after February 1, 1937, of charging 50 cents per ton for the use of their piers. Presumably this charge is reasonable, not being in excess of the value of the service furnished.

Defendants filed with the Pennsylvania Public Service Commission tariffs proposing the charge in question. On January 26, 1937, a hearing was held before the Director of Wharves, Docks and Ferries of the City of Philadelphia, pursuant to authority alleged to have been conferred by section 14 of the Act of June 8, 1907, P. L. 488. A further hearing was held on February 1, 1937, at the conclusion of which the director rendered a decision against the railroad defendants denying the right to impose the announced wharfage charges. On March 9, 1937, the Public Service Commission, after previously suspending the tariffs, decided that it did not have jurisdiction over wharfage charges for the use of piers and wharves in Philadelphia, and discontinued the proceeding before it to sustain tariffs filed by defendants. Defendants then filed in the court below a bill for an injunction to restrain the Director of Wharves, Docks and Ferries from interfering in any manner with their levying the charges in question. The

prayer of the bill was granted, and a preliminary injunction against the director was awarded, the ground of the lower court's decision being that neither the United States Maritime Commission nor the Director of Wharves, Docks and Ferries of the City of Philadelphia has any rate-making jurisdiction to regulate or control the charges sought to be imposed by defendants, and that such jurisdiction resides solely in the Public Utility Commission of the Commonwealth, and since the latter had not acted in the matter, such wharfage charges were not forbidden. From this decision the director has appealed to this court, in the case of *Philadelphia Piers, Inc., v. McCaughn,* 329 Pa. 147, 196 A. 861.

Immediately thereafter plaintiff in the case of original jurisdiction, McNeely and Price Co., a shipper engaged in foreign commerce, filed in the court below a bill of complaint praying for an injunction against defendants restraining them from imposing the charges in question. The ground of the complaint is that the Pennsylvania Public Utility Commission, having succeeded to the authority and jurisdiction of the former Public Service Commission, on May 10, 1937, revoked the order of the Public Service Commission and directed that the proceeding in respect of the tariffs in question be listed for reargument on the question of its jurisdiction to regulate the rates thereof; and that pending such determination by the Public Utility Commission defendants have no right to collect the wharfage charges, not having filed tariffs with the Public Utility Commission, as required by law. This court on petition by defendants brought up the record in this matter from the lower court, and instituted it herein as an original proceeding. The plaintiff filed herein an amended bill of complaint, stating the same grounds, and to this defendants filed preliminary objections.

The grounds of these objections raise, not a question of the statutory law of the State, but a Federal ques-

tion. This question is whether, in view of the fact that defendants seek to impose the wharfage charges only upon goods moving in foreign commerce over their piers, the Commonwealth of Pennsylvania or any municipality or administrative agency thereof has any jurisdiction to regulate the same or to interfere in any manner in the levying of such charges by defendants. Defendants' contention is that, foreign commerce alone being involved, regulation of wharfage charges is solely within the power and jurisdiction of the Federal government and its administrative agencies duly established to that end. It is said, first, that the subject of the regulation of wharfage charges, being national in scope and effect, comprises a sphere in which state law has no power to operate, irrespective of whether regulatory legislation has been enacted by Congress; and, secondly, it is maintained that even if the subject matter is one in which state regulatory law may legitimately operate in the absence of controlling federal legislation, Congress has entered the field and undertaken to regulate the matters in question, and that this has been done either by the Federal Interstate Commerce Act of 1887 and its amendments, or by the Shipping Act of 1916, as amended.

Defendants advance the contention that, although formerly, in the absence of federal regulation, states or their municipal subdivisions were empowered to regulate charges in the nature of dockage or wharfage fees on vessels discharging or receiving cargo in their harbors or for the use of wharves operated therein, this was the case only at earlier periods when such matters were assumed to be of merely local concern. The contention is made that in more recent times the subject has become one of national importance, because of the complex network of transportation facilities now covering the entire country, each part having a necessary interrelation with every other part. It is argued that the Interstate Commerce Commission is now and for many

years has been engaged in the process of determining and fixing rates for interstate carriage of freight between inland points and ports of delivery, and that, since wharfage rates have an effect on the flow of interstate commerce, the fixing of them has ceased to be a matter merely of such local interest and significance as to justify state regulation.

There is no evidence before us of the extent to which the imposition of wharfage charges has become a matter of preëminently national concern, or of the nature and degree of its effect upon interstate and foreign commerce. In its absence it cannot be taken for granted that wharfage charges have entered the category of exclusively federal questions regardless of whether or not Congress has taken action in respect to them. All the earlier decisions of the Supreme Court of the United States indicate that the regulation of wharfage and dockage rates and the determination of what are and what are not reasonable charges is a subject of local concern subject to state regulatory power in the absence of applicable Federal legislation.

In the case of *Cannon v. New Orleans*, 87 U. S. 577, 582, the court had before it the question of the validity of an ordinance of the City of New Orleans imposing a duty on any vessel landing at that port on the basis of its tonnage. The court struck down the tax as a violation of the constitutional prohibition against a state's levying a duty of tonnage without the consent of Congress, but in doing so it said at page 582: "In saying this we do not understand that this principle interposes any hindrance to the recovery from any vessel landing at a wharf or pier owned by an individual or by a municipal or other corporation, a just compensation for the use of such property. It is a doctrine too well settled, and a practice too common and too essential to the interests of commerce and navigation to admit of a doubt, that for the use of such structures, erected by *individual* enterprise, and recognized everywhere as private prop-

erty, a reasonable compensation can be exacted. And it may be safely admitted also that it is within the power of the State to regulate this compensation, so as to prevent extortion, a power which is often very properly delegated to the local municipal authority."

In *Packet Co. v. Keokuk,* 95 U. S. 80, a wharfage charge levied by a municipality, based on the tonnage of the vessel using its wharf, was sustained as reasonable and as within the power of the public authority which owned the wharf. In cases such as this and the foregoing, a more aptly descriptive term for such a charge would be the modern expression "dockage," and to-day wharfage is considered rather a fee levied for the use of the wharf by freight or merchandise in respect of which the fee is charged. Nevertheless, there is no apparent distinction in the power of the state or its subdivision to impose or regulate a charge on the one or the other.

In *Packet Co. v. Catlettsburg,* 105 U. S. 559, the power of a municipality under state authority to charge reasonable fees for the docking of vessels at its wharf was sustained. In referring to the subject of the establishment by state authority of rules, regulations, and charges in respect to the use by vessels of ports and wharves, the court said, at page 563: "We are not aware that in any instance Congress has attempted to exercise it. If it be a regulation of commerce under the power conferred on Congress by the Constitution, that body has signally failed to provide any such regulation. It belongs also, manifestly, to that class of rules which, like pilotage and some others, can be most wisely exercised by local authorities, and in regard to which no general rules applicable alike to all ports and landing-places, can be properly made. If a regulation of commerce at all, it comes within that class in which the States may prescribe rules until Congress assumes to do so: *Cooley v. Board of Wardens,* 12 How. 299; *Gilman v. Philadelphia,* 3 Wall. 713; *Crandall v. State of*

*Nevada,* 6 Id. 35; *Pound v. Turck,* 95 U. S. 459. There is probably not a city or large town in the United States, situated on a navigable water, where ordinances, rules, and regulations like those of the Town of Catlettsburg are not made and imposed by authority derived from State legislation, and the long acquiescence in this exercise of the power, and its absolute necessity, are arguments almost conclusive in favor of its rightful existence."

Again in *Transportation Co. v. Parkersburg,* 107 U. S. 691, the court, defining wharfage as compensation which the owner of a wharf demands for the use thereof, declared at pages 700-702, 704: "We have said that the reasonableness of wharfage must be determined by the local law until some paramount law has been prescribed. By this we mean, that until the local law is displaced or overruled by paramount legislation adopted by Congress, the courts have no other guide, no other law to administer on the subject than the local or State law. . . . Now wharves, levees, and landing-places are essential to commerce by water, no less than a navigable channel and a clear river. But they are attached to the land; they are private property, real estate; and they are primarily, at least, subject to the local State laws. Congress has never yet interposed to supervise their administration; it has hitherto left this exclusively to the States. There is little doubt, however, that Congress, if it saw fit, in case of prevailing abuses in the management of wharf property,—abuses materially interfering with the prosecution of commerce,—might interpose and make regulations to prevent such abuses. When it shall have done so, it will be time enough for the courts to carry its regulations into effect by judicial proceedings properly instituted. But until Congress has acted, the courts of the United States cannot assume control over the subject as a matter of Federal cognizance. It is Congress, and not the Judicial Department, to which the Constitution has given the power

to regulate commerce with foreign nations and among the several States. The courts can never take the initiative on this subject. There are cases, it is true, which are so national in their character, and in which it is so essential that a general or national rule should exist, that any interference by the State legislatures therewith is justly deemed to be an invasion of the power and authority of the general government; and in such cases the courts will interpose to prevent or redress the commission of acts done or attempted to be done under the authority of such unconstitutional laws. In such cases, the nonaction or silence of Congress will be deemed to be an indication of its will that no exaction or restraint shall be imposed. Such is the import of the various passenger cases in which this Court has pronounced unconstitutional any tax, duty, or other exaction imposed by the States upon emigrants landing in the country. Such is also the import of those cases in which it has been held that State laws imposing discriminating burdens upon the persons or products of other States are unconstitutional; it being deemed the intent of Congress that interstate commerce shall be free, where it has not itself imposed any restrictions thereon." See also *Ouachita Packet Co. v. Aiken,* 121 U. S. 444.

In *The Minnesota Rate Cases,* 230 U. S. 352, Mr. Justice HUGHES referred in significant language to the powers of the states in such matters of local concern at page 402: ". . . there necessarily remains to the States, until Congress acts, a wide range for the permissible exercise of power appropriate to their territorial jurisdiction although interstate commerce may be affected. It extends to those matters of a local nature as to which it is impossible to derive from the constitutional grant an intention that they should go uncontrolled pending Federal intervention. Thus, there are certain subjects having the most obvious and direct relation to interstate commerce, which nevertheless,

with the acquiescence of Congress, have been controlled by state legislation from the foundation of the Government because of the necessity that they should not remain unregulated and that their regulation should be adapted to varying local exigencies; hence, the absence of regulation by Congress in such matters has not imported that there should be no restriction but rather that the States should continue to supply the needed rules until Congress should decide to supersede them." And citing specific instances of such powers, the Justice said (p. 405) that "while the State may not impose a duty on tonnage . . ., *it may regulate wharfage charges* and exact tolls for the use of artificial facilities provided under its authority. The subject is one under state control, where Congress has not acted, although the payment is required of those *engaged in interstate or foreign commerce."* (Italics supplied.)

In the recent case of *Clyde Mallory Lines v. Alabama,* 296 U. S. 261, fees imposed under state authority in pursuance of harbor regulation were sustained by the court on the authority in part of the foregoing cases. The court said at pages 267-268: "2. The present fee to defray the cost of a purely local regulation of harbor traffic is not an objectionable burden on commerce. State regulations of harbor traffic, although they incidentally affect commerce, interstate or foreign, are of local concern. So long as they do not impede the free flow of commerce and are not made the subject of regulation by Congress they are not forbidden: *Willson v. Black-Bird Creek Marsh Co.,* 2 Pet. 245; *Gibbons v. Ogden,* 9 Wheat. 1, 209; *Cooley v. Board of Wardens,* supra, 314; *Gilman v. Philadelphia,* 3 Wall. 713; *Pound v. Turck,* 95 U. S. 459; *Escanaba Co. v. Chicago,* 107 U. S. 678; *Cardwell v. American Bridge Co.,* 113 U. S. 205; *Willamette Bridge Co. v. Hatch,* 125 U. S. 1; *Lake Shore & M. S. Ry. Co. v. Ohio,* 165 U. S. 365; *Cummings v. Chicago,* 188 U. S. 410; *Manigault v. Springs,* 199 U. S. 473; see *Brown v. Houston,* 114 U. S.

622, 631; *Minnesota Rate Cases,* 230 U. S. 352, 363, 407. And charges levied by state authority to defray the cost of regulation or of facilities afforded in aid of interstate or foreign commerce have consistently been held to be permissible. Such charges were considered and upheld in *Packet Co. v. Keokuk,* supra; *Morgan's Steamship Co. v. Board of Health,* supra; *Transportation Co. v. Parkersburg,* supra, 701, *et seq.; Ouachita Packet Co. v. Aiken,* supra, 448, *et seq.; Huse v. Glover,* supra. See *Sands v. Manistee River Improvement Co.,* 123 U. S. 288. A similar exercise of state power is the imposition of inspection or license fees incident to or in support of local regulations of interstate commerce: *Patapsco Guano Co. v. Board of Agriculture,* 171 U. S. 345; *McLean & Co. v. Denver & Rio Grande R. Co.,* 203 U. S. 38, 54; *Red 'C' Oil Mfg. Co. v. Board of Agriculture,* 222 U. S. 380; *Savage v. Jones,* 225 U. S. 501; *Merchants Exchange v. Missouri,* 248 U. S. 365; *Pure Oil Co. v. Minnesota,* 248 U. S. 158. Its most recent manifestation is the levy of a tax which represents a reasonable charge upon interstate automobile traffic passing over state highways, upheld in *Kane v. New Jersey,* 242 U. S. 160; *Clark v. Poor,* 274 U. S. 554; *Interstate Busses Corp. v. Blodgett,* 276 U. S. 245; *Hendrick v. Maryland,* 235 U. S. 610."

We know of no case which holds that the subject of wharfage charges is of such national moment that any attempt at state regulation of them would per se be an intrusion into a forbidden field. It is clear that the sphere of wharfage rate regulation is one which is subject to state regulatory power in the absence of controlling Federal legislation on the subject.

This conclusion brings us face to face with this question: Has Congress by appropriate enactment so manifested its intent to supervise and control matters in connection with wharfage rates as to call for the retirement of state regulation?

It is contended that the Act of Congress of September 7, 1916, as amended, 46 U. S. C. A., sec. 801 et seq.,

known as the Shipping Act, has so extended the authority of the Federal Government over wharfage regulation to leave no room for state interference. By this act certain powers and duties were vested in an administrative commission designated as the United States Shipping Board. Authority to regulate wharfage in certain specified respects was incontrovertibly conferred upon the Shipping Board by this act. By the Act of June 29, 1936, 46 U. S. C. A., sec. 1114, these powers and duties were subsequently transferred from the Shipping Board to the United States Maritime Commission, so that whatever authority in the premises the Shipping Board formerly had is now vested in the Maritime Commission.

The Shipping Act relates to three distinct classes of business, to wit: (A) Water carriers in foreign commerce, (B) Water carriers in *interstate* commerce, and (C) "Other persons subject to the act" who furnish terminal facilities, inter alia, wharfage facilities. It prohibits discriminatory acts by *any* of these classes of business (46 U. S. C. A., sec. 815). It prohibits in section 816, paragraph 1, discriminatory rates by water carriers engaged in foreign commerce (that is, Class A, supra) and it provides (sec. 817) for regulation of rates as to water carriers engaged in interstate commerce (that is, Class B, supra). In the second paragraph of section 816 it provides that "Every such carrier [i. e., common carriers by water in foreign commerce] and every other person subject to this chapter [in which is included any person carrying on the business of forwarding or furnishing wharfage, dock, warehouse or other terminal facilities in connection with a common carrier by water] shall establish, observe, and enforce just and reasonable regulations and practices relating to or connected with the receiving, handling, storing, or delivering of property. Whenever the board finds that any such regulation or practice is unjust or unreason- 'able it may determine, prescribe, and order enforced a

just and reasonable regulation or practice. (Sept. 7, 1916, c. 451, sec. 17, 39 Stat. 734.)"

While the words "rates" or "rate-making power" are not used in the Shipping Act in respect to the Shipping Board's power over *Class C,* supra, we hold that the phrase "just and reasonable regulations and practices" as used in paragraph 2 of section 816 above quoted, is comprehensive enough to give the Shipping Board power over Class C.

We have also reached the conclusion that in the *Interstate Commerce Act,* as at present amended, Congress intended to confer and did confer upon the Interstate Commerce Commission power to regulate the wharfage charges of these defendants, to the exclusion of any state regulation. A consideration of the act itself and of its interpretation and application by the Federal courts sustain this conclusion.

The first section of the act (February 4, 1887, as amended: 49 U. S. C. A., sec. 1) is phrased in broad and general terms. The transportation subject to regulation is "of passengers or property wholly by railroad, or partly by railroad and partly by water when both are used under a common control, management, or arrangement for a continuous carriage or shipment" in interstate or foreign commerce: 49 U. S. C. A., sec. 1 (1) (a). The regulatory power is conferred only so far as the transportation is within the United States. The term "railroad" is defined as including, together with bridges and ferries operated in connection with any railroad, all "terminals, and terminal facilities of every kind used or necessary in the transportation of the persons or property designated" in the act. "Transportation" is defined to include "all instrumentalities and facilities of shipment or carriage . . . and all services in connection with the receipt, delivery, . . . transfer in transit . . ., storage and handling of property transported." The term "common carrier" includes "all persons, natural or artificial, engaged in such

transportation . . . as common carriers for hire": 49 U. S. C. A., sec. 1 (3).

A wharf or dock is clearly an "instrumentality" or "facility of shipment or carriage," and the operator of it for public use furnishes a service of value and necessity "in connection with the receipt, delivery and transfer in transit . . . of property transported." Unquestionably the railroad defendants herein are common carriers engaged in interstate commerce by rail, and they operate most of the piers in question. The fourth defendant, Philadelphia Piers, Inc., operates its wharf, as averred in the bill of complaint, in the business, inter alia, of "transferring import and export freight between ocean-going vessels and railroad cars . . . for transportation to and from foreign countries," and likewise freight not served by rail to and from the pier. As such, it cannot be considered as in a different situation from that of the railroad carriers. An inference is warranted that there is between itself and the defendant railroads which serve its pier at least an "arrangement for a continuous carriage or shipment" in the type of commerce which here concerns us, its close connection with the rail carriers being apparent.

Undoubtedly, as the Court said in *Penna. R. R. Co. v. Public Utilities Commission of Ohio,* 298 U. S. 170, 174, "Not all commerce is transportation, and not all transportation is by common carriers by rail. . . . The question is whether it is that particular form of interstate commerce which Congress has subjected to regulation in respect of rates by a federal commission. The Interstate Commerce Act (49 U. S. C. A., sec. 1, *et seq.*) is aimed at common carriers exclusively, sec. 1 (1), (3), and not even at all these. With exceptions plainly unrelated to this case, sec. 1 (1) (b), (c), carriers, even though .common, are unaffected by the act unless they are carriers wholly by railroad, or if partly by railroad and partly by water, are operating under 'a common control, management, or arrangement for a continuous

carriage or 'shipment.' . . . There are limitations, moreover, in respect of the conduct to be controlled in addition to the foregoing limitations in respect of the carriers to be regulated. Even though the activities are those of common carriers by rail, the statute does not apply 'to the transportation of passengers or property . . . wholly within one State and not shipped to or from a foreign country from or to any place in the United States': Sec. 1 (2) (a), (b)."

Nevertheless, the defendant companies are engaged in transportation, within the definition of the act and, likewise by definition, defendants are common carriers engaged in such transportation in foreign commerce, the only type of commerce sought to be affected by the charges in question. It is immaterial that the rates to be imposed are for a service or facility furnished solely in Pennsylvania, and hence of a wholly intrastate nature. Such service or facility is but part, and an indispensable part, of a shipment in foreign commerce. In *United States v. Erie R. R. Co.,* 280 U. S. 98, the question was whether the Federal Commission had authority to establish rates with respect to that portion of a shipment in foreign commerce which was wholly intrastate in character, from a foreign port to a port in New Jersey, thence to a New Jersey destination. The court sustained the jurisdiction of the Commission, and said, at page 101: "But the nature of the shipment is not dependent upon the question when or to whom the title passes: *Pennsylvania R. Co. v. Clark Coal Co.,* 238 U. S. 456, 465-6. It is determined by the essential character of the commerce: *Baltimore & Ohio S. W. R. Co. v. Settle,* 260 U. S. 166, 170. It is not affected by the fact that the transaction is initiated or completed under a local bill of lading which is wholly intrastate: *Ohio R. R. Commission v. Worthington,* 225 U. S. 101, 108-110; *Texas & New Orleans R. Co. v. Sabine Tram Co.,* 227 U. S. 111; *Hughes Bros. Co. v. Minnesota,* 272 U. S. 469; or by the fact that there may be a detention before

or after the shipment on the local bill of lading: *Carson Petroleum Co. v. Vial,* 279 U. S. 95. . . . The rail transportation is in fact a part of foreign commerce."

In *Penna. R. R. Co. v. Public Utilities Commission of Ohio,* supra, the court referred to the foregoing case with renewed approval, pointing out (p. 176) that the transportation by rail was a part of foreign commerce, in which case the Interstate Commerce Act (49 U. S. C. A., sec. 1 (1) (c), (2) (a)) applies to that part of the act of transportation which takes place within a single state. It is no doubt true, as said in *Wilmington Transportation Co. v. Calif. R. R. Commission,* 236 U. S. 151, 153, that "the Interstate Commerce Commission has not been authorized to prescribe rates for water transportation unconnected with transportation by railroad," and it is perhaps equally true that under the present statute the Commission has no rate-making authority with respect to any other kind of transportation, service, or facility furnished which is unassociated with carriage by rail. This does not dispose of the present case in favor of plaintiff, however, because admittedly the wharfage facilities afforded by all the defendants are furnished in respect to carriage to and from the piers both by rail and likewise by carriage unconnected with railroads. As we have pointed out, they are common carriers and they supply transportation within the description of the act.

We think the decisions of the United States Supreme Court in the two following cases are decisive of the pending controversy: (1) *Southern Pacific Terminal Co. v. Interstate Commerce Commission & Young,* 219 U. S. 498. (2) *New York Central & Hudson River Railroad Co. v. Board of Chosen Freeholders of the County of Hudson,* 227 U. S. 248.

In the first case the Supreme Court held that the Interstate Commerce Commission has jurisdiction to regulate charges of a terminal company which is part of a railroad and steamship system and operates terminals

such as those of the Southern Pacific Terminal at Galveston, Texas. That case was begun by a bill in equity to enjoin an order of the Interstate Commerce Commission requiring appellants to cease and desist, on or before a certain date and for a period of not less than two years thereafter, from granting and giving undue preferences and advantages to a shipper of cotton seed products at the port of Galveston, Texas, through failure to exact from him payment of wharfage charges for handling cotton seed cake and meal over the wharves, docks and piers of appellants, while at the same time exacting such charges from other shippers of cotton seed cake and meal. The relief prayed for was denied by the court below, and the decree was affirmed. Among the errors assigned in the action of the Circuit Court in dismissing the bill of complaint were the following: "(1) The Interstate Commerce Commission had no jurisdiction over the Terminal Company, (2) . . . (3) . . . (4) The Commission by its order assumed to control intrastate and foreign commerce, not subject to the act to regulate commerce." The Supreme Court, in an opinion by Justice McKenna, held: "The property of the Terminal Company is 'necessary in the transportation or delivery' of the interstate and foreign freight transported by the lines of the Southern Pacific system. . . . It is with the system that the law must deal, not with its elements. . . . The terminal facilities which the Terminal Company was authorized to maintain were for the system, not for the corporate elements considered separately. . . . The wharves were intended for shipping facilities, a means of transition from land carriage to water carriage. . . . The manufacture or concentration on the wharves of the Terminal Company are but incidents . . . in the transshipment of the products in export trade and their regulation is within the power of the Interstate Commerce Commission. To hold otherwise would be to disregard, as the Commission said, the substance of things and make evasions of the act of Congress quite easy. It makes no differ-

ence, therefore, that the shipments of the products were not made on through bills of lading or whether their initial point was Galveston or some other place in Texas."

In the "(2)" case cited, the Supreme Court held, inter alia, that no portion of the business of a ferry which is part of an interstate railway is under the control of the State and that the state authorities have no power to regulate the fare of passengers, whether railroad passengers or not, on the ferry between Weehawken, New Jersey, and New York City. In 1905 the Board of Chosen Freeholders of Hudson County, New Jersey, adopted two ordinances, one fixing the rate for foot passengers ferried from New Jersey to New York and the other for a round trip commencing on the New Jersey shore, which rates were applicable to the ferries in question. The New York Central and Hudson River Railroad, engaged as a lessee in operating the lines of the West Shore Railroad and its railroad ferries, commenced this proceeding to prevent the enforcement of the rates fixed by the ordinances. The contention was that the ordinances were an unwarranted interference with the interstate business of the company and that the enforcement of the ordinances would constitute a direct burden on interstate commerce, which could not be done consistently with the Constitution. The Supreme Court of New Jersey maintained the contentions of the railroad company. The Court of Errors and Appeals reversed the judgment of the Supreme Court. The case reached the Supreme Court of the United States. Chief Justice WHITE, speaking for the Supreme Court, said: "The plaintiff in error insists, not following the exact order of its argument, *a*, that the assailed ordinances are repugnant to the commerce clause because Congress has legislated concerning railroad ferries and thereby manifested its purpose that there should be no longer room for the exertion of state power on the subject; and, *b*, that if this is not so it is now necessary to pass on the question reserved in the *St. Clair Case* [192

U. S. 454], and to decide that the ruling in the *Covington Bridge Case* [154 U. S. 204] affirmatively established that interstate ferriage like that here in question is so absolutely within the power of Congress as to exclude even in case of the inaction of Congress the presumption of a license for the exercise of state power." On the other hand, it was contended that " 'The decision of the *Gloucester Ferry Case,* 114 U. S. 196, decided in 1885, established Federal jurisdiction to legislate concerning ferriage over boundary streams, but did not turn what had been an exclusive state jurisdiction into an exclusive Federal jurisdiction. State laws on this subject are still valid until superseded by a Federal statute.' . . . 'In the absence of Federal legislation the States have all the power that they have been accustomed to exercise.' . . . It is insisted that the court below rightly upheld the assailed ordinances because there has been no action by Congress exerting its authority over the subject with which the ordinances deal and therefore no room for the contention that it was not within the power of the State to enact them." The Supreme Court then said: "We are called upon only . . . to determine the single and simple question whether there has been such action by Congress as to destroy the presumption as to the existence in the State of vicarious and revocable authority over the subject. We say simple question because its decision is, we think, free from difficulty, in view of the express provision of the first section of the Act to Regulate Commerce (Act of February 4, 1887, c. 104, 24 Stat. 379), subjecting railroads as therein defined to the authority of Congress, and expressly declaring that 'the term railroad as used in this act shall include all bridges and ferries used or operated in connection with any railroad, and also all the road in use by any corporation operating a railroad, whether owned or operated under a contract, agreement or lease. . . .' The inclusion of railroad ferries within the text is so certain and so direct as to require nothing but a consideration of the text itself. Indeed, this

inevitable conclusion is not disputed in the argument for the defendant in error, but it is insisted that as the text only embraces railroad ferries and the ordinances were expressly decided by the court below only to apply to persons other than railroad passengers, therefore the action by Congress does not extend to the subject embraced by the ordinances. But as all the business of the ferries between the two States was interstate commerce within the power of Congress to control and subject in any event to regulation by the State as long only as no action was taken by Congress, the result of the action by Congress leaves the subject, that is, the interstate commerce carried on by means of the ferries, free from control by the State. We think the argument by which it is sought to limit the operation of the act of Congress to certain elements only of the interstate commerce embraced in the business of ferriage from State to State is wanting in merit. In the absence of an express exclusion of some of the elements of interstate commerce entering into the ferriage, the assertion of power on the part of Congress must be treated as being coterminous with the authority over the subject as to which the purpose of Congress to take control was manifested. Indeed, this conclusion is inevitable since the assumption of a purpose on the part of Congress to divide its authority over the elements of interstate commerce intermingled in the movement of the regulated interstate ferriage would be to render the national authority inefficacious by the confusion and conflict which would result. The conception of the operation at one and the same time of both the power of Congress and the power of the States over a matter of interstate commerce is inconceivable, since the exertion of the greater power necessarily takes possession of the field, and leaves nothing upon which the lesser power may operate."

Plaintiff attempts to distinguish the last case cited from the instant case, by saying: "Due to the fact that there is an express grant to the Interstate Commerce

Commission of jurisdiction over ferries in the Interstate Commerce Act (sec. 3) and the ferry in question was used to transport both railroad passengers and nonrailroad passengers between New Jersey and New York, the Supreme Court upheld the action of the Interstate Commerce Commission in fixing rates for both types of passengers, since to do otherwise would have resulted in discrimination or preference against the railroads involved." We do not regard this distinction as a substantial one. The sections of the Interstate Commerce Act, already cited in this opinion, mention "instrumentalities and facilities of shipment or carriage" as *expressly* as they do the word "ferries," and, as we have already pointed out, a wharf or dock is palpably an "instrumentality and facility of shipment or carriage." The power of the Interstate Commerce Commission under the act quoted to regulate wharfage fees is as undeniable as its power to regulate ferriage. The evil to be avoided, according to the opinion expressed by Chief Justice WHITE in the case just quoted from, was the rendering of "the national authority inefficacious by the confusion and conflict which would result" from leaving *both* the Federal and State governments in "possession of the field." Therefore the Supreme Court declared in effect that in the field defined either in specific or general terms in the Interstate Commerce Act, only one sovereign could exercise its will, that sovereign being the United States.

It is, of course, well settled that any Act of Congress on any phase of interstate commerce, supersedes any state statute which is in conflict therewith. It appears to be equally well settled that when the national legislature enters any field of regulation into which it is constitutionally admissible, the state legislature already occupying the same field must get out even though no statutory expression of the national legislature has as yet come into conflict with a state regulation.

In *Northern Pacific Ry. Co. v. State of Washington,* 222 U. S. 370, the facts were that the railway company, in operating a train on its road in the State of Washington, permitted some of the train crew to remain on duty more than sixteen consecutive hours, this being apparently contrary to the prohibition of the act of Congress known as the "Hours of Service" law. The train was moving from one point to another in the State of Washington and was carrying merchandise which had originated at points outside of the State and was in transit through the State to a foreign destination. This train was held to be an interstate train, despite the fact that it may also have been carrying some local freight. The Supreme Court, in an opinion by Chief Justice WHITE, held: "In view of the unity and indivisibility of the service of the train crew and the paramount character of the authority of Congress to regulate commerce, the Act of Congress was exclusively controlling: *Southern Railway Co. v. United States,* 222 U. S. 20. But while thus governed by the act of Congress the prohibitions of that act were not operative. This follows by reason of the provisions of section 5 to the following effect: 'That this Act shall take effect and be in force one year after its passage.' " It was not in effect at the time that some of the crew were permitted to work as above stated. About a month before the occurrences giving rise to that case, a law in the State of Washington regulating the hours of service of railway employees became effective. The provisions of that act greatly resembled those of the act of Congress referred to. The Attorney General of the State commenced a proceeding to recover penalties for the violation of the state law. The railroad denied any liability for the penalties imposed by the state law. The denial was based upon the assertion that the train was an interstate train, and was not subject to the control of the State because within the exclusive authority of Congress, manifested by the enactment of Congress on that

subject. The trial court granted a motion for judgment upon the pleadings and awarded one thousand dollars penalty and the Supreme Court of the State of Washington affirmed it. An appeal to the United States Supreme Court followed. The prosecution based its case on the ground that Congress had not acted on the subject, and therefore the state regulation should be applied. Chief Justice WHITE said further: "Thus [the State] conceding the paramount power of Congress, the operative force of the state law was solely maintained over the interstate commerce in question because of the provision of the act of Congress providing that it should not take effect until one year after its passage. . . . We are of the opinion that this view is not compatible with the paramount authority of Congress over interstate commerce. . . . The right of a state to apply its police power for the purpose of regulating interstate commerce, in a case like this, exists only from the silence of Congress on the subject, and ceases when Congress acts on the subject or manifests its purpose to call into play its exclusive power. . . . As the enactment by Congress of the law in question was an assertion of its power, by the fact alone of such manifestation that subject was at once removed from the sphere of the operation of the authority of the State. . . . If it be that it [the postponement of the operation of the law] was contemplated that the subject dealt with should be controlled during the year by state laws, the postponement of the prohibitions of the act could accomplish no possible purpose. . . . In the second place, the obvious suggestion is that the purpose of Congress in giving time was to enable the necessary adjustments to be made by the railroads to meet the new conditions created by the act, a purpose which would of course be frustrated by giving to the provision as to postponement a significance which would destroy the very reason which caused it to be enacted."

In *New York Central Railroad Co. v. Winfield,* 244 U. S. 147, the Supreme Court, in an opinion by Mr. Justice VAN DEVANTER, held that the liabilities and obligations of interstate railroad carriers to make compensation for personal injuries suffered by their employees while engaged in interstate commerce are regulated both inclusively and exclusively by the Federal Employers' Liability Act; and, Congress having thus fully covered the subject, no room exists for state regulation, even in respect of injuries occurring without fault, as to which the federal act provides no remedy.

In *Kansas City Southern Railway Co. v. Van Zant,* 260 U. S. 459, the Supreme Court, in an opinion by Justice McKENNA, held: "The provision for passes [in the Interstate Commerce Act and its amendment of 1906] . . . is a regulation of interstate commerce. . . . We think, therefore, free passes *in their entirety* are taken charge of, not only their permission and use, but the limitations and conditions upon their use [italics supplied]."

In *Napier v. Atlantic Coast Line Railroad Co.,* 272 U. S. 605, the Supreme Court, in an opinion by Mr. Justice BRANDEIS, held that the Boiler Inspection Act, as amended, has so occupied the field of regulating locomotive equipment on interstate highways, that state legislation requiring cab curtains and automatic firebox doors, is precluded and such matters are left to the regulatory power reposed by the Act in the Interstate Commerce Commission. In his opinion Mr. Justice BRANDEIS said: "It is suggested that the power delegated to the Commission has been exerted only in respect to minor changes or additions [in the equipment of locomotives 'with safe and suitable boilers and appurtenances thereto']. But this, if true, is not of legal significance. It is also urged that, even if the Commission has power to prescribe an automatic firebox door and a cab curtain, it has not done so; and that it has made no other requirement inconsistent with the state

legislation. This, also, if true, is without legal signifi-
cance. The fact that the Commission has not seen fit
to exercise its authority to the full extent conferred, has
no bearing upon the construction of the Act delegating
the power. We hold that state legislation is precluded,
because the Boiler Inspection Act, as we construe it,
was intended to occupy the field. The broad scope of
the authority conferred upon the Commission leads to
that conclusion."

In *Missouri Pacific Railroad Co. v. Porter*, 273 U. S.
341, the Supreme Court, in an opinion by Mr. Justice
BUTLER, held that the Act to Regulate Commerce, re-
quiring carriers to establish and enforce just and rea-
sonable regulations affecting "the issuance, form and
substance" of bills of lading, applies to provisions in
bills of lading affecting liability of railroads for loss of
property received by them for transportation over an
interstate inland route to a seaport for delivery to a
foreign vessel for ocean carriage to a nonadjacent for-
eign country, and that a state law forbidding such
stipulations is therefore as applied to such shipments
invalid in view of the occupation of the field by Con-
gress. Justice BUTLER pointed out that "No Act of
Congress or order of the commission prescribed a form
of bill of lading for this shipment [i. e., the shipment in
question]. . . . But that does not sustain their con-
tention that Congress has not evinced an intention to
regulate bills of lading for transportation such as is
here involved. Section 1 (6) extends to all carriers and
to all transportation subject to the Act; it prescribes
a general rule applicable to all regulations and prac-
tices affecting the form or substance of bills of lading
in order that they may be just and reasonable. And
the commission is empowered and directed to enforce
the rule. The general regulation of the 'issuance, form,
and substance' of bills of lading is broad enough to
cover contractual provisions, like the one involved in
this case, exempting railroads from liability for loss of

shippers' property by fire. Congress must be deemed to have determined that the rule laid down and the means provided to enforce it are sufficient and that no other regulation is necessary. Its power to regulate such commerce and all its instrumentalities is supreme; and, as that power has been exerted, state laws have no application. They cannot be applied in coincidence with, as complementary to or as in opposition to, federal enactments which disclose the intention of Congress to enter a field of regulation that is within its jurisdiction."

In the case of *Chicago, Rock Island & Pacific Ry. Co. v. Hardwick Farmers Elevator Co.*, 226 Pa. 426, the facts were that Minnesota enacted a law requiring any railway company subject to its provisions to furnish, on demand by a shipper, cars for transportation of freight, at terminal points on its line of road in Minnesota within forty-eight hours and at intermediate points within seventy-two hours after such demand, Sundays and legal holidays excepted. An action was started to recover from the Railway Company penalties for violation of this statute. A verdict was returned for the plaintiff, and a judgment entered on the verdict was affirmed by the Supreme Court of Minnesota. The Supreme Court of the United States, in an opinion by Chief Justice WHITE, said: "On behalf of the Railroad Company it is insisted that even upon the assumption that the State had power to deal with the subject for which the statute provides in the absence of legislation by Congress, the enactment is nevertheless void, since it but expresses a policy which by penalization, fines and forfeitures will substitute for a free and unrestrained flow of commerce a service favoring a particular locality." On the other hand, it was contended that the action of the Supreme Court of Minnesota was correct, in sustaining the statute upon the hypothesis that Congress had not legislated on the subject and that the act was a reasonable exertion of the power of the State.

Chief Justice WHITE said further: "We are not, however, called upon to test the merits of these conflicting contentions. . . . In the original act to regulate commerce the term 'transportation' was declared to embrace all instrumentalities of shipment or carriage. . . . And all services in connection with the receipt, delivery, elevation, and transfer in transit, . . . storage, and handling of property transported. . . . As legislation concerning the delivery of cars for the carriage of interstate traffic was clearly a matter of interstate commerce regulation, even if such subject was embraced within that class of powers concerning which the State had a right to exert its authority in the absence of legislation by Congress, it must follow in consequence of the action of Congress to which we have referred that the *power of the State over the subject matter ceased to exist from the moment that Congress exerted its paramount and all-embracing authority over the subject* [italics supplied]."

A review of the foregoing cases leads us to the conclusion that the field of "regulation of wharfage charges," where agencies of respectively the State of Pennsylvania and the City of Philadelphia attempt to operate governmentally, has been occupied exclusively by the federal government since that government gave expression to its will in the Interstate Commerce Act and its amendments. To borrow phrases from the Supreme Court Justices in the opinions quoted: The Interstate Commerce Act "as we construe it, was intended to occupy that field" (Justice BRANDEIS); "Congress having fully covered the subject, no room exists for state regulation even in respect [to things] as to which the federal act [as yet] provides no remedy" (Justice VAN DEVANTER); "Its [Congress's] power to regulate such commerce and all its instrumentalities is supreme; and as that power has been exerted state laws have no application" (Justice BUTLER); "The conception of the operation at one and the same time of both the

power of Congress and the power of the States over a matter of interstate commerce is inconceivable, since the exertion of the greater power necessarily takes possession of the field, and leaves nothing upon which the lesser power may operate" (Chief Justice WHITE) ; "In the original act to regulate commerce the term 'transportation' was declared to embrace all instrumentalities of shipment or carriage . . . and power of the State over the subject matter ceased" when "Congress exerted its paramount authority over the subject" (Chief Justice WHITE).

In an article on "The Effect of Congressional Legislation on State Power to Regulate Railroads," in Volume 31 of Columbia Law Review, page 450 (March, 1931), "the various aspects of railroading which are subject to regulation" are divided into "(1) rates, (2) extensions and abandonments of line, (3) spurs, (4) connections, (5) depot facilities, (6) service, (7) finance, (8) liability to shippers and passengers, (9) safety, and (10) labor." In regard to "(6) service," it is stated at page 455: "In dealing with interstate freight service requirements, the courts have been particularly free in finding exclusive Congressional occupancy of the field." In the case before us, we find *"exclusive congressional occupancy of the field."*

In the historic case of *Gibbons v. Ogden,* 9 Wheaton 1, Justice JOHNSON, in his concurring opinion said (page 229) : "Commerce, in its simplest signification, means an exchange of goods; but in the advancement of society, labor, transportation, intelligence, care, and various mediums of exchange, become commodities, and enter into commerce; the subject, the vehicle, the agent, and *their various operations,* become the objects of commercial regulation [italics supplied]." Chief Justice MARSHALL, in writing the opinion for the United States Supreme Court in the same case, said (page 209) : " 'To regulate' implies . . . full power over the thing to be regulated; it excludes, necessarily, the action of all

others that would perform the same operation on the same thing. That regulation is designed for the entire result, applying to those parts which remain as they were, as well as to those which are altered. It produces a uniform whole, which is as much disturbed and deranged by changing what the regulating power designs to leave untouched, as that on which it has operated."* As Chief Justice WHITE said in *Northern Pacific Ry. Co. v. State of Washington* (supra): "The right of a state . . . in a case like this . . . ceases when Congress . . . manifests its purpose to call into play its exclusive power [to regulate]."

In the next to the last paragraph of plaintiff's brief in rebuttal, appears the following statement: "The Court in deciding this case is faced with the question of whether it should regard the decision of the Circuit Court of Appeals for the Second Circuit in the *M. L. C. No. 10 Case* [10 Fed. (2d) 699], or the decision of the Supreme Court of Washington in the *Luckenbach Case* [*Luckenbach S. S. Co., Inc., v. Denney*, 278 Pac. 419], as authority."

In the "M. L. C." Case, *the issue* raised in the case at bar was not raised and therefore not decided. The real issue in *that* case was as to the meaning of the phrase "private wharf." Circuit Judge HOUGH, writing the opinion for the court, said: "What is meant by 'private wharf' is primarily to be ascertained by the law of the State of New York. . . . We hold . . . on this record these libellants are private wharf owners" and the authority to charge for wharfage "is implicit." He then states that "the right of regulating rates is recognized generally as a sovereign power, either by the nature of the estate as a franchise, or the nature of the occupation as being affected by a public interest. . . . See *Murphy v. Montgomery*, 11 Ala. 586, which is exactly

---

* Chief Justice MARSHALL quoted these words as an "argument of great force" and said that "the Court is not satisfied that it has been refuted."

the case of the Bush Company as pleaded, and especially *Cannon v. New Orleans,* 20 Wall. 577, 22 L. Ed. 417, which covers the whole matter thus: 'It is a doctrine too well settled, and a practice too common and too essential to the interests of commerce and navigation to admit of a doubt, that for the use of such structures [wharves], erected by individual enterprise, and recognized everywhere as private property, a reasonable compensation can be exacted. And it may be safely admitted also that it is within the power of the state to regulate this compensation, so as to prevent extortion, a power which is often very properly delegated to the local municipal authority.' " Judge HOUGH then says: "From these authorities [meaning apparently the two cases he cited], which might be multiplied, we hold these private wharf-owning libellants hold a species of franchise from the State of New York, by which alone they possess the right to charge wharfage, that the maintenance of a wharf whether used for the storage of goods or for mooring purposes or both is in New York as elsewhere an occupation, in Hale's still modern phrase 'affected with a public interest,' and therefore subject to rate regulation by that public." What the Circuit Court said which lends support to plaintiff's contention in the instant case that wharfage fees are a matter exclusively of state regulation was not said *on the issue now before us* and it was seemingly based on dictum in the *Cannon v. New Orleans Case* (supra), which the Circuit Court's opinion "especially" referred to. In the *New Orleans Case* it was held that an ordinance of the City of New Orleans, which demanded of all steamboats which shall moor or land in any part of the port of New Orleans a sum measured by the tonnage of the vessel, was a tonnage tax within the meaning of the Federal Constitution and was therefore void. Justice MILLER of the United States Supreme Court was very careful to state that the *only* question that would be considered was whether or not the challenged charge was a violation of the constitutional provision

which "forbids the States to levy *any duty of tonnage* without the consent of Congress [italics supplied]." He expressly declared that the Court would *not* consider any provision of the Constitution which grants to Congress the right to regulate commerce with foreign nations. Therefore, so far as the decision of the Circuit Court of Appeals of the Second District, above cited, rests upon *Cannon v. New Orleans,* it is not authority for the proposition that a wharfage charge made in respect to goods involved in interstate commerce, under the authority of a state is not an interference with the power of the Federal government to regulate commerce. In *Murphy v. Montgomery* (supra), which was the other supporting case cited in the Circuit Court's opinion, the Supreme Court of Alabama said: "The true question is whether the wharf and steamboat company, or the city authorities of Montgomery, are entitled to the wharfage or toll paid for unlading at the wharf, since January 1, 1845 [when the possessory right of the company ceased]." It is clear that the issue raised on the record now before us was not raised on the record before the highest court of Alabama in the case cited.

In another part of the opinion in the "M. L. C." Case (supra), Judge HOUGH said: "The questions arising in the case as stated are primarily of New York law; for, subject to the paramount right of navigation, the national Constitution and laws have left the laws and usages relating to lands bordering on tidewater and to land below high-water mark to the supervision and regulation of the several states." In support of that statement Judge HOUGH cites *Shively v. Bowlby,* 152 U. S. 1. That case held nothing inconsistent with defendants' position in the instant case. Its holding applicable to this case was (p. 47) that "the ownership of and dominion and sovereignty over lands covered by tidewaters, or navigable lakes, within the limits of the several States, belong to the respective States within which they are found, with the consequent right to use or dispose of any portion thereof, when that can be done without

substantial impairment of the interest of the public in such waters, and subject to the paramount right of Congress to control their navigation *so far as may be necessary for the regulation of commerce:* 146 U. S. 387, 435, 437, 465, 474 [italics supplied]."

In the instant case, unlike the "M. L. C." Case, it is earnestly contended by the defendants that the regulation of wharfage on land "bordering on tidewater" (to quote Judge HOUGH's phrase) is a matter in which the State of Pennsylvania must yield its "dominion and sovereignty" to the paramount right of the United States "so far as may be necessary for the regulation of commerce." It is clear that the "M. L. C." Case lends no support to the position taken by plaintiff in the case now before us.

On the other hand, in the *Luckenbach Case* (decided in 1929), referred to above, the Supreme Court of the State of Washington held, as we hold in this opinion, that the authority to regulate and control interstate commerce cannot be divided and the authority of the United States is absolute. The court said in that case: "We are satisfied that the trial judge was right in holding that the attempted regulation [of wharfage] here complained of would be a direct burden upon interstate commerce, and cannot be sustained under the decisions of the United States Supreme Court, by which such cases are governed. . . . If the federal interstate commerce regulations do not apply to respondent as a wharfinger, the shipping board legislation does. The field is therefore entirely occupied by federal legislation and regulations. In such case it is well settled that the state is deprived of any authority to regulate such utilities."

The "ferry cases" are clearly distinguishable from the case at bar. In *Port Richmond and Bergen Point Ferry Co. v. Board of Chosen Freeholders of Hudson County,* 234 U. S. 317, cited by plaintiff, the Supreme Court held that since the "transportation was for a short dis-

tance, . . . and unrelated to other transportation," the state had the power to fix rates, and said in an opinion by Mr. Justice HUGHES: "Ferries, such as are involved in the present case, are simply means of transit from shore to shore. These have always been regarded as instruments of local convenience which, for the proper protection of the public, are subject to local regulation." The court clearly stated: "We dismiss from consideration those ferries which are operated in connection with railroads, and cases, if any, where the ferriage is part of a longer and continuous transportation." In the case of *Mayor of Vidalia v. McNeely, Admrx.,* 274 U. S. 677, a like decision was reached and like views as to ferries being instruments of mere "local convenience" were expressed.

If we are "faced with the question" (as plaintiff states) of whether we regard the decision of the Circuit Court of Appeals for the Second Circuit in the "M. L. C. No. 10 Case" (supra), or the decision of the Supreme Court of Washington in the "Luckenbach Case" (supra) "as authority," we will resolve the question so faced by saying that we regard the opinion in the "M. L. C. No. 10 Case" as *in*apposite to this case, and the opinion in the Luckenbach Case in respect to the exclusive possession of "the field" by federal legislation and regulations, as *apposite and correct,* it being in accord both with sound reason and with the decisions in cognate cases of the highest judicial authority in the land, to wit: the Supreme Court of the United States.

The relief sought is an injunction restraining defendants from collecting or attempting to collect the proposed charges pending determination of the jurisdiction of the Public Utility Commission or the proper filing therewith of tariffs and schedules of rates. We decide that the Commission named is without jurisdiction in the matter, the governmental agencies of the State being impuissant in the presence in the same field of the paramount authority of the government of the United States.

The bill is dismissed, at the cost of the plaintiff.

SEPARATE OPINION BY MR. JUSTICE LINN:

I concur in the dismissal of the bill on the ground that by the Maritime Commission legislation Congress has taken possession of the field to the exclusion of the State.