## THE M. L. C. NO. 10. THE LEVIATHAN. THE SOUTHERN CROSS. THE ALLAN.

(Circuit Court of Appeals, Second Circuit. February 1, 1926.)

Nos. 182–185.

1. **Wharves ⊜19—Petitions impleading owners of steamers in libels for wharfage against harbor craft, lighters, etc., held subject to peremptory exception (admiralty rule 56).**

In libels for wharfage against harbor craft, lighters, etc., receiving cargo from or delivering it to steamers at libelant's pier, petitions impleading owners of steamers under admiralty rule 56, alleging a custom of so receiving and delivering cargo, and that any sums due were due from owners of steamers, without any averment of custom or contract of steamer to pay lighter wharfage, *held* subject to peremptory exception.

2. **Wharves ⊜19—Steamers held not "jointly liable" for lighter wharfage as such, and not subject to be impleaded under admiralty rule in libel therefor (admiralty rule 56).**

In libel for wharfage against harbor craft, lighters, etc., receiving cargo from or delivering it to steamers at libelant's piers *held* owners of steamers, if liable at all, were not "jointly liable"; hence, under admiralty rule 56, petitions purporting to implead them conferred no jurisdiction.

3. **Wharves ⊜9.**

Dock company leasing wharf may reserve right to charge wharfage against vessels not owned or chartered by lessee.

4. **Wharves ⊜4.**

"Private wharf," as respects title, means only one, privately owned, but, as respects use, one from which public may be excluded.

[Ed. Note.—For other definitions, see Words and Phrases, Private Wharf.]

5. **Navigable waters ⊜36(1)—Lands bordering on tidewater and below high-water mark subject to state regulation.**

Subject to paramount right of navigation, federal Constitution and laws have left laws and usages relating to lands bordering on tidewater and to land below high-water mark to supervision and regulation of state.

6. **Wharves ⊜16.**

Right of private wharf owner to charge wharfage is implicit.

7. **Wharves ⊜17—Wharf owners held "private wharf owners," engaged in business affected by public interest, subject to rate regulation.**

Dock company, to which state conveyed "a restricted beneficial interest in and to" land under water for erection of piers thereon, and company stipulated to be owner in fee of wharf, whose interest in land was not shown, *held* "private wharf owners," holding species of franchise, whose business of furnishing wharfage to all without restriction was affected by a public interest and subject to rate regulation.

8. **Wharves ⊜16—Private wharf owner may validly contract for wharfage at less than statutory rate, though immunity from state regulation is determined from actual use rather than from fact of private ownership.**

Private wharf owner may reserve wharf for himself or his lessee or licensee, and may make valid contract to furnish wharfage at other than statutory rate; but in determining whether a private wharf owner is immune from state rate regulation affecting wharves offered to public regard must be had to use to which wharf was actually devoted rather than to fact of private ownership.

**9. Wharves ⬤⟻17—Private wharf owners held subject to rate regulation, and not entitled to more than statutory rate (New York City Charter, § 859; Laws N. Y. 1923, c. 477).**

Private wharf owners offering their wharves to public generally, *held* not entitled to recover wharfage at rate greater than fixed by commission under New York City Charter, § 859, as amended by Laws N. Y. 1923, c. 477, though they had published a higher rate, which was known to craft accepting wharfage.

Appeals from the District Court of the United States for the Eastern District of New York.

Three libels by the New York Dock Company against the lighter M. L. C. No. 10, her tackle, etc., the Marine Equipment Corporation, and the Marine Lighterage Corporation, claimants, wherein Furness, Withy & Co., Limited, were impleaded, and against the lighter Leviathan, her tackle, etc., the Atlantic Lighterage Corporation, claimant, wherein the Grace Line, Inc., was impleaded, and against the lighter Southern Cross, her engines, etc., the Atlantic Lighterage Corporation, claimant, and a fourth libel by the Bush Terminal Company against the lighter Allan, her tackle, etc., the Henry Gillen Sons Lighterage Company, Inc., claimant. From decrees sustaining the libels, but dismissing the petitions impleading the companies named, claimants appeal. Decrees reversed, and causes remanded, with directions.

All these suits are in rem for wharfage, and all the vessels proceeded against are domestic harbor craft—i. e., lighters, barges, or scows—and the wharfage accrued at sundry piers in Brooklyn.

The Dock Company proved that the piers at which it demands wharfage were built on land under water conveyed to it by the state of New York in 1902, by a deed which granted "a restricted beneficial enjoyment in and to" said land under water. The nature of this "beneficial enjoyment" is set forth in the conveyance as follows:

"To fill in the lands under water herein granted out to the bulkhead line, and to erect thereon piers and docks or slips and structures of a substantial character, * * * reserving to all and every the said people [of New York] the full and free right, liberty, and privilege of entering upon and using all and every part of the above-described premises in as ample a manner as they might have done, had this power and authority not been given, always excepting such parts thereof as are actually occupied and covered by structures, docks, or buildings of a substantial character, and such parts of said premises as have been actually filled in and reclaimed from low or marsh land."

The Dock Company had erected at its own cost the wharves or piers in question, and had leased them to steamship proprietors for the purpose of "the discharging, loading, or docking of steamers." But in these leases the tenant agreed that the Dock Company "may and shall have the right to collect wharfage on all lighters, barges, and other craft bringing merchandise to or taking freight from said piers or to or from vessels berthed thereat, provided that no wharfage shall be collected on lighters, barges, or similar craft owned or chartered by the tenant."

In the three causes brought by the Dock Company, lighters not owned or chartered by the tenant had come to its piers and there made fast, either to the pier itself or to a vessel attached thereto. One lighter came for some undisclosed purpose of its own, the second to deliver cargo to a vessel there loading under the authority of the tenant, and the third to receive cargo from a vessel similarly unloading at the pier.

In the cases where the lighter's purpose in coming to the pier was to deliver cargo to a vessel or receive cargo from it, the owners and/or charterers of that vessel were impleaded by the claimants of the lighter on the theory (semble) that, because the lighters came to the pier to aid the steamer, the steamer owner was liable over to the lighter owner for the cost of coming to the wharf side.

The steamer owners repudiated all liability for wharfage charges on lighters under the circumstances shown. None of the claimants of the lighters denied that some wharfage was due, but some of them set up that they were not liable to pay the rate charged by the Dock Company, but were liable only at a lower rate, which lower rate had recently been fixed by authority of the Legislature of New York acting through the commissioners of the sinking fund of the city of New York.

Both the Dock company and the Bush Company had refused to be bound by or limited to the rates fixed by the sinking fund commissioners. Each had proclaimed its own rates. Each of the lighters had notice of the aforesaid refusal of the libelants to recognize the right of the Legislature to regulate its rates.

The nature of the title of the Bush Company to the land under water on which its piers stand is not fully proven; but its libel asserts that it is a New York corporation, au-

thorized by charter "to conduct the business of wharfinger," and that at the times in question it was the "owner in fee and in possession of certain wharves" on the Brooklyn water front, to one of which the lighter sued came for purposes of its own, and these allegations are by stipulation admitted to be true. The court below, referring largely to its previous decision in Beard v. Marine, etc., Co. (D. C.) 296 F. 146, sustained the libels, substantially on the ground that the lighters' owners had contracted to pay the amounts for which the libels were filed, but dismissed the petitions under the fifty-sixth rule, on the ground that neither by any proven contract or custom could any such liability rest upon steamships receiving cargo from or discharging cargo into lighters, as was asserted by these petitions. Thereupon the various claimants appealed.

Abraham M. Grill, of New York City, for appellants.

Davies, Auerbach & Cornell, of New York City (Harper A. Holt, Charles E. Hotchkiss, Alexander J. Feild, and Murray C. Bernays, all of New York City, of counsel), for appellees.

Julius Henry Cohen, of New York City (Wm. Victor Goldberg, of New York City, on the brief), for Port of New York Authority, amicus curiæ.

Park, Mattison & Lynch, of New York City (Samuel Park and Anthony V. Lynch, Jr., both of New York City, of counsel), for respondents impleaded.

Before ROGERS, HOUGH, and MACK, Circuit Judges.

HOUGH, Circuit Judge (after stating the facts as above). [1, 2] The petitions by which the shipowners were impleaded are something of a curiosity, and should, as matter of pleading, have been met by a peremptory exception.

After setting out that the lighters libeled had either taken export cargo to an outgoing steamer or received imported goods from an incoming vessel, each petition avers that "there was and still is a general custom and usage in the shipping and lighterage business to the effect that * * * general cargoes delivered to [or from] other steamships under the same or similar circumstances [i. e., as in the import and export cases] shall be and are delivered by lighters, barges, or other similar craft." Wherefore, as each petition avers, "if any sums are due to the libelant for wharfage out of the facts aforesaid, the said sums are due by" the impleaded owner of the steamer that (as the case might be) delivered cargo to or received it from the vessel libeled for wharfage.

A more complete non sequitur cannot be imagined. There may be—indeed, there certainly is—a custom so to transport goods in this harbor; but it is not even alleged that there is any custom "to the effect" that steamers taking goods out of New York or bringing them in shall pay the wharfage incurred by the lighters pursuing that customary trade; much less is any contract averred covering this particular wharfage.

But, whether, under the circumstances, there was any liability on steamer owners by reason of wharfage incurred by lighters, we shall not consider, because it seems plain that, even had the pleading been tolerable, there was no jurisdiction over the impleader.

No one pretends that any person or thing, other than the lighters or their owners, was ever liable for wharfage as wharfage; no suits for lighter wharfage would ever have lain against the cargo receiving or delivering steamer. What is asserted against the steamer is, if anything, a derivative liability, or liability over.

This court has ruled plainly against using the fifty-sixth rule under such circumstances, holding that the intent of the rule is only "to bring in a party *jointly* liable for the wrong complained of" in the libel. Aktieselskabet Fido v. Lloyd Braziliero, 283 F. 62, at page 72. This view of the rule's scope must be now recognized as authoritative in this circuit.

Having thus eliminated the steamer owners, these cases are all alike, except that two claim wharfage at leased piers of the Dock company, and two similar wharfage at piers (one belonging to Bush Company) which, so far as shows, are operated directly by a libelant deriving revenue only from wharfage paid by casually visiting vessels.

[3] We may briefly note that we perceive no reason why Dock company could not, on leasing a pier or wharf, reserve the right to charge wharfage against vessels not owned or chartered by the lessee. The visiting vessels were no worse off than before lease. There is no doubt that a wharf owner may convey by lease all the "wharfage cranage," etc., of said property, and he can also convey only part of it, as Dock company did here.

[4] Further we note that into the question, both interesting and vexatious, of the nature and extent of water front, foreshore, and land under water ownership along the Brook-

lyn or Long Island shore, we do not find it necessary to enter, but shall assume for purposes of decision that each libelant is a private wharf owner; i. e., the proprietor in his own right of an edifice called a wharf standing on his own land. That Bush Company owns its land "in fee," while Dock company has but "a restricted beneficial enjoyment" thereof, is we think of no consequence. Each libelant has sufficient title to support a *private* wharf. So far as *title* is concerned, *private* wharf means no more than that the structure is owned by a private citizen; its other implications we shall consider later.

As will more fully appear hereafter, one entitled to charge wharfage is entitled to a *reasonable* charge therefor. These libelants are suing for a charge which by stipulation is reasonable, yet claimants insist that they should pay only a much smaller charge, because that was the statutory rate for wharfage at the times in suit. But this is not a "rate case"; there is neither pleading nor evidence to support a holding that the statutory rates are either unreasonable or confiscatory. It follows that we must assume that both rates are reasonable; certainly we cannot hold the statutory rate unreasonable merely because a higher rate is agreed to as also reasonable.

[5] The questions arising in the case as stated are primarily of New York law; for, subject to the paramount right of navigation, the national Constitution and laws have left the laws and usages relating to lands bordering on tide water and to land below high-water mark to the supervision and regulation of the several states. Shively v. Bowlby, 152 U. S. 1, 14 S. Ct. 548, 38 L. Ed. 331. And the same is true of the rights of riparian owners along navigable streams. Weems, etc., Co. v. People's Co., 214 U. S. 345, 29 S. Ct. 661, 53 L. Ed. 1024, 16 Ann. Cas. 1222.

Thus the nation has never sought to regulate the matters at bar, and, indeed, so far as the harbor of New York is concerned, it has made no regulation on the subject of wharves, piers, or docks, except the well-known limitation on length created by the maintenance of an external pierhead line.

It follows that what is meant by the phrase "private wharf" is primarily to be ascertained by the law of the state of New York. We have pointed out that these wharves are private, in the sense of being privately owned; but the adjective imports more than mere ownership. It must, we think, be granted that in this state the owner of a private wharf may exclude the public from its use. He may forbid any one to use it, except those to whom he leases, or to whom he grants a license. So much was plainly held, and in respect of the Brooklyn water front, in Wetmore v. Brooklyn, etc., Co., 42 N. Y. 384. By exclusion the same result was reached in respect of the same water front in Kafline v. Brooklyn, etc., Co., 180 App. Div. 858, 168 N. Y. S. 120, where a *public* wharf is defined as one "to which the vessels and the public can resort, either at will or on assignment of a berth by a harbor authority." And a wharf to which the public cannot resort and at which berths cannot be obtained through the harbor authority may well be called *private*.

To the same effect is the general law as understood in the courts of the United States, for it was held in Dutton v. Strong, 1 Black, 23, 17 L. Ed. 29, that the owner of a pier which was private property might cut loose therefrom even a vessel which was using the same as a refuge from storm, and the exact point adjudged (as explained in Shively v. Bowlby, supra) was that the vessel had been wrongfully attached to the pier, and therefore no wrong was wrought by cutting her loose. That a private pier might be erected, even at the end of a public street, was recognized in Louisville, etc., Co. v. West Coast Co., 198 U. S. 483, 25 S. Ct. 745, 49 L. Ed. 1135, which case was explicitly followed in Weems, etc., Co. v. People's Co., supra.

From these cases, and the reason of the matter, we infer and hold that the test of the privacy of a wharf is the right and power of the private owner to exclude the public from the use of what he owns; and, further, the right of exclusion implies, as usual, the right of selection, and the private wharf owner may treat any one who uses his wharf without his permission as a trespasser. On this record these libelants are such private wharf owners.

[6] It may be noted that, while Bush Company asserts that it has a chartered right to exact wharfage (an admitted allegation), there is nothing in the grant by the state to Dock company explicitly authorizing any charge. We think such authority is implicit; a point well treated (though on very different facts) by Brown, District Judge, in Town of Pelham v. The B. F. Woolsey (D. C.) 16 F. 418.

Since what is sued for is called "wharfage," and the right to sue rests upon history as contained in the law reports, we note the change of meaning within about a century in the use or meaning of the word "wharfage."

The modern use is well illustrated in The Idlewild, 64 F. 603, 12 C. C. A. 328, where the word was defined as "a pecuniary charge, in the nature of rent, to which vessels are liable for the use of a dock or wharf." Hale, De Portibus (Harg. Law Tracts [Ed. 1787] pp. 76, 77, c. 6), defines wharfage (or *keyage*) as "a toll or duty for the pitching or lodging of goods upon a wharf."

But, even as late as the earlier editions of Bouvier's Dictionary, the word was defined as "the money paid for landing goods upon or loading them from a wharf," and a wharfinger was a person who kept a wharf "for the purpose of shipping and receiving merchandise to and from it for hire." The older term for what is now called "wharfage" was "dockage," of which the latest uses known to us are the opinions in The B. F. Woolsey, supra, and in People v. Roberts, 92 Cal. 659, 28 P. 689. Other and earlier instances of American use of the word in a sense suggesting to us *warehousing* rather than wharfage are Rodgers v. Stophel, 32 Pa. 111, 72 Am. Dec. 775, and Fitzsimmons v. Milner, 2 Rich. (S. C.) 370.

This use is important because through it was worked out the wharfinger's lien. The English cases declaring a lien all used the word in the older sense, and lien was based on *usage,* concerning which Lord Kenyon said that "the usage has been proven so often that I assume it." Naylor v. Mangles, 1 Esp. 109 (1794); Spears v. Hartly, 3 Esp. 81, per Eldon; Rex v. Humphery, McClel. & Yo. 173.

The *maritime* lien for wharfage in any sense seems to have been asserted first in 1829, and in Johnson v. The McDonough, Gilp. 101, Fed. Cas. No. 7,395. This and other early American cases were all considered in The Kate Tremaine, 5 Ben. 60, Fed. Cas. No. 7,622, a decision of Benedict, District Judge (in 1871), which is the foundation in this circuit of the lien now accorded. The question of lien upon vessels in their home ports was left untouched in Ex parte Easton, 95 U. S. 68, 24 L. Ed. 373, but this court fully accepted the doctrine of The Kate Tremaine in Scow No. 15, 92 F. 1008, 35 C. C. A. 149.

The nature of wharfage as a service to *navigation* (cf. The C. Vanderbilt [D. C.] 86 F. 785, affirmed as The America, 93 F. 986, 34 C. C. A. 682), and the foregoing authorities are sufficient reasons for rejecting the objections still urged to the form of these suits.

The nature of wharfage aside from its relation to navigation is also important. Hale, C. J., in his De Portibus, ubi supra, said more than two centuries ago: "A man may for his private advantage set up a wharf, and can agree with his customers for the use of it;" also, if a man have a public wharf and crane, and other conveniences, they "are affected with a public interest, and they cease to be juris privati only."

Blackstone (book 2, c. 3) enumerates wharfage as a franchise and incorporeal hereditament, and classes wharfingers with innkeepers, ferrymen, and the like. This idea passed into the case law of New York, and in Lansing v. Smith, 4 Wend. (N. Y.) 9, at page 21 (21 Am. Dec. 89), Walworth, C., declared: "But even the taking of a common wharfage, or toll at a ferry, is a franchise, subject to the control and regulation of the Legislature, and cannot be lawfully exercised without their permission." And 70 years later the same doctrine was repeated in Flandreau v. Elsworth, 151 N. Y. 473, 45 N. E. 853, thus: "The right to collect wharfage rests upon the statute; it is a franchise dependent upon a grant from the sovereign power. * * * It is given as a compensation to persons who, under the authority of law, have constructed piers and wharves, and to remunerate them for the outlay made for the convenience and safety of vessels and the benefit conferred thereby upon commerce and navigation." And in this state it has even been held possible for a municipality under legislative authority to impose wharfage upon vessels going to piers privately owned by the vessel owners. Mayor, etc., v. Trowbridge, 5 Hill (N. Y.) 71, affirmed 7 Hill (N. Y.) 429.

The right of regulating rates is recognized generally as a sovereign power, either by the nature of the estate as a franchise, or the nature of the occupation as being affected by a public interest. See Murphy v. Montgomery, 11 Ala. 586, which is exactly the case of the Bush Company as pleaded, and especially Cannon v. New Orleans, 20 Wall. 577, 22 L. Ed. 417, which covers the whole matter thus:

"It is a doctrine too well settled, and a practice too common and too essential to the interests of commerce and navigation to admit of a doubt, that for the use of such structures [i. e., wharves], erected by individual enterprise, and recognized everywhere as private property, a reasonable compensation can be exacted. And it may be safely admitted also that it is within the power of the

state to regulate this compensation, so as to prevent extortion, a power which is often very properly delegated to the local municipal authority."

The subsequent remark of Bradley, J., in Transportation Co. v. Parkersburg, 107 U. S. 691, 2 S. Ct. 732, 27 L. Ed. 584, regarding the rights of a private wharf, which the owner "reserves for his private use," is not relevant to the present discussion, and must in any event be understood with the limitation placed upon it in Weems, etc., Co. v. People's, etc., Co., supra, at page 358 (29 S. Ct. 661).

[7] From these authorities, which might be multiplied, we hold these private wharf owning libelants hold a species of franchise from the state of New York, by which alone they possess the right to charge wharfage, that the maintenance of a wharf whether used for the storage of goods or for mooring purposes or both is in New York as elsewhere an occupation, in Hale's still modern phrase "affected with a public interest," and therefore subject to rate regulation by that public.

[8] A private owner who reserves his wharf for himself or for his lessee or licensee has the admitted right so to do; but, as was very aptly said in Barrington v. Commercial, etc., Co., 15 Wash. 170, 45 P. 748, 33 L. R. A. 116 (1896), a riparian owner on navigable waters may erect upon his own land a wharf and he may operate it for profit; but "in determining the character of [this] wharf regard should be had to *the use to which it has been devoted* rather than its private ownership."

The facts of that case are in legal effect those here presented on behalf of the Dock Company. There as here, it was admitted that the wharf was privately owned, and that the private owner could exclude the whole world therefrom if he wished to, but the court there asked, and we here inquire, what have these wharf owners actually done? We find they have not forbidden the whole world to use their wharf, they have not restricted use to lessees and the like, but have invited all and sundry to come; they have not even forbidden those who (as occurred in one of these cases) declared that they would come yet would pay no more than the statutory rate.

If a wharf owner offers his conveniences to the public, if for a uniform price of his own fixing he offers service to all, he is in effect a public servant, and his wharf public. He cannot have his cake and eat it, nor behave like a public wharfinger, yet remain immune from that regulation which admittedly affects owners of public wharves, and which we hold affects all wharves offered to the public.

Libelants, however, strenuously assert that because they gave notice of their charges, and are private wharf owners, any one who came to and used their wharves impliedly assented to their rates, and so made a contract.

That a binding contract may be made concerning wharfage, notwithstanding any and all statutes regulating wharfage rates presently existing or in force in the past in this state may be admitted. There was a time when New York statutory rates were higher than the market, competition brought down the price faster than did the statutes, and it was permissible to bargain for a lower rate than the statutory. The Antonio Zambrana (D. C.) 88 F. 546. Nowadays it may be true that the market has risen above the statute, and it is permissible to make a *bargain* for a price greater than the statutory one, nor can the shipowner use the statute to evade his promise. The state has not sought to make wharfage rates with the rigidity that the United States has regulated prices for moving goods in interstate commerce. This last point was ruled in The Allan Wilde (C. C. A.) 264 F. 291, a decision which cannot be extended to justify the assertion that this court even intimated that a price deemed reasonable would be recoverable, rather than the statutory rate, if no specific bargain had been made. Nor was it true in that case that libelant had invited the public to use his wharf.

[9] These libels all count on a promise to pay more than the statutory rate, and the promise is sought to be made out as heretofore stated, by showing that the lighters came *knowing* what would be the price. The matter is said to be similar to the case of one who, on being told the price of an article, says I refuse to pay that price, but will pay another price, and then without more takes the article; and we are referred to Morgan v. Reading, 3 Smedes & M. (Miss.) 366, and The Magnolia v. Marshall, 39 Miss. 109, for illustrations of the doctrine in cases arising from the use of wharves. They are excellent illustrations, but this style of argument begs the question. The doctrine of sales, just referred to, is beside the point, unless and until it be held either that private wharves are immune from state regulation, or that New York has not sought to regulate

any rate of a private wharf owner. The matter was better and more briefly put in Southern, etc., Co. v. Sparks, 22 Tex. 657, 75 Am. Dec. 793, in substance thus: It cannot be doubted that a wharfinger, no less than a common carrier, may make what contract he pleases as to his compensation. If a tavern keeper, warehouseman or wharfinger specifies charges and gives notice, one who avails himself of the service assents to the charges.

But we have held that even a private wharfinger is not immune from regulation, and that these wharfingers, in respect of such craft as these at bar, the very handmaids of harbor work, never stood them off, never refused them facilities, made their wharves public as to them. This conduct of libelants is perhaps not relevant to the abstract right of the state to regulate private wharf owners, but it is relevant to the intent of the state to regulate just the trade here concerned, lighter and dumb barge charges.

The regulatory statute is an amendment of 1923 (Laws N. Y. 1923, c. 477) to section 859 of the New York City Charter (Laws 1901, c. 466). The operative words are: "It shall be lawful to charge  *  *  *  wharfage and dockage from every vessel  *  *  * that makes fast to any pier, wharf, or bulkhead, within said city or makes fast to any vessel lying at such pier," etc.; "at rates to be fixed by the commissioners of the sinking fund after public hearing.  *  *  *  *"

This is a statute made long after Brooklyn became part of the city of New York. It is admitted that the hearings provided for were had and were participated in by private wharf owners, and we can have no doubt that it was the legislative intent to reach and regulate the business which and the owners who are before us now.

To summarize, we hold that libelants are private wharf owners; that they have the right to totally exclude the public from their wharves, but that all wharf owners are by the nature of their occupation subject to public regulation in the matter of price. New York has never regulated prices for the exclusive use of private piers, or any portion thereof, when reached by private bargain. A private wharf owner, who invites every one to come to his wharf and use it at his own price, is conducting a business plainly affected by a public use and peculiarly subject to regulation. This business has been regulated by New York, and that regulation affects libelants.

Decrees reversed, with one bill of costs

10 F.(2d)—45

in this court, to be paid in moieties by the two libelants. Causes remanded, with directions to enter decrees in conformity with this opinion. The costs below are left to the discretion of the District Court.