GARCIA & DIAZ, INC., Respondent, *v.* TRANS WORLD REFINING CORPORATION, Appellant.

First Department, July 6, 1961.

*Alvin L. Arnold* of counsel ( *Frederick P. Glick,* attorney), for appellant.

*John L. Quinlan* of counsel (*John B. Shields* with him on the brief; *Bigham, Englar, Jones & Houston,* attorneys), for respondent.

BERGAN, J. Plaintiff operates Piers 15 and 16 on the East River under revocable permits issued by authority of the City of New York as public owner of the wharves. Excessively long occupancy of the piers by goods placed on them by the defendant for the purpose of loading on shipboard having occurred, the parties contracted for a charge to be paid after a specified date by the defendant for continued occupancy of the piers by the goods.

The charge thus agreed upon has been found reasonable at Special Term upon a record which would sustain reasonableness, and judgment has been directed accordingly for plaintiff; the question here is whether the parties could lawfully have agreed on such a reasonable charge which the plaintiff might enforce by this action.

Since plaintiff claims no title to the piers, its rights in respect of their usage and its power to control their occupancy by cargo goods must be found in the terms of its permits from the city and in the statutory frame and administrative regulations upon which the permits rest.

Plaintiff's permits, one for each pier, were issued pursuant to subdivision b of section 707 of the New York City Charter. This section, headed "Leases of wharf property," provides that the Commissioner of Marine and Aviation may "grant temporary permits terminable at will" to "use and occupy" any wharf property in the Port of New York as defined in section 706 "belonging to" the city.

It seems reasonable to think that the difference between a lease of "any wharf property" (§ 707, subd. a) and a permit "to use and occupy" wharf property under subdivision b is merely a matter of duration of time and of the right of the city to terminate the special privilege on the wharf. The terms of plaintiff's licenses were that it would "use said property for steamship operations" of steamship companies for which the plaintiff acted as agents.

Whether Piers 15 and 16 be regarded as "public wharves" in the sense that the title to them had been acquired by the city for the general purposes of the port and hence the city was fully in dominant legal control of how long the plaintiff's rights should persist and how they should be exercised; or whether they be regarded as "private wharves" in the sense that a special private interest in them had been lawfully acquired by the plaintiff which for the moment had the hallmarks of title,

it seems clear that defendant had no right, as a member of the general public, to lay down its goods on these piers for the purpose of loading on board of steamships, or storage, or for its own convenience, without plaintiff's consent.

This legal right of the plaintiff under its permits to exclude defendant from the piers requires that for the purposes of this controversy we must treat the piers as private wharves even though in some jural relations other than those asserted in this litigation between these parties, they may very well be regarded in legal theory as public wharves. Whatever the general contour of the public-private wharf problem may be, it seems to have no controlling significance on the narrow actualities of this lawsuit.

The public-private wharf problem is partly semantic. Judge HOUGH helped in the process of definition in *The M. L. C. No. 10* (10 F. 2d 699) by noting that "a wharf to which the public cannot resort" and "at which berths cannot be obtained" through the harbor authority "may well be called" private (p. 702).

In that case a dock company which had erected a wharf in the port on land under water conveyed by deed from the State of New York under restrictions which led the court to think that the dock company held "a species of franchise" from "the state of New York" (p. 704) was held to be entitled to charge wharfage; but the court also held that the amount charged was subject to public regulation. In the same direction in respect of a liability arising from the condition of a private wharf to a member of the public, see *Kafline* v. *Brooklyn Eastern Dist. Term. Co.* (180 App. Div. 858, affd. 228 N. Y. 521).

There may, of course, be situations where the claims of the owners of private wharves must yield to public interests in the movement of commerce. One is by the demands of necessity, as, for example, where the wharf is the sole facility available in that part of navigable water. As to this Mr. Justice BRADLEY in *Transportation Co.* v. *Parkersburg* (107 U. S. 691, 699) was of opinion that it was open to question whether a private wharf might be maintained at all in such a situation (cf. *Weems Steamboat Co.* v. *People's Co.*, 214 U. S. 345, 358). Another is the reasonableness of the charge; and in this one aspect — the charge — the private wharf seems to be treated as something of a public utility. (See TOWNLEY, J., in *Marine Lighterage Corp.* v. *Luckenbach S. S. Co.*, 139 Misc. 612.)

Decisional law, therefore, seems to suggest two principles: (a) that a special legal right in a wharf acquired by title, or

by lease or license from the owner of the title, carries with it the right to limit and control public usage of the facility, subject to paramount public regulation; and (b) that charges for the use of such a wharf must conform with the standards fixed by public authority.

No charges were fixed by the City of New York or by the present City Charter regulating storage of goods on wharves generally; nor was the subject provided in the licenses for these wharves particularly. On the other hand there was no prohibition against the charges here agreed upon; and the court at Special Term aptly commented that "We search in vain for express or implied provisions in plaintiff's permits prohibiting the charges sued for here. Nor do we find in the Rules and Regulations of the Department of Marine and Aviation any such prohibition." (25 Misc 2d 604, 606.)

There remains the possibility that charges of the kind agreed upon are deemed prohibited, absent some express authorization; and in favor of this theory it must be conceded that the licenses from the city to the plaintiff certainly did not contemplate that these waterfront piers, vital to commerce, be used as warehouses. Further, and perhaps more important, the whole history of the development of the port by public authority negatives a purpose to permit it to be clogged up by storing goods in the waterfront wharves. To a very large extent, however, this is a matter between the city and its licensee; and there can be no doubt that a permit "terminable at will" (§ 707, subd. b) left public control of the course of operations on these two piers wholly unrestricted.

We thus reach the vital center of this controversy. We think the charges agreed upon are sustainable, not because the licensee had the right to conduct warehouse or storage operations on the piers, but because the undue usage by defendant of the piers for which the charges have been agreed upon, were an incident to the purpose for which plaintiff was licensed to use the piers, i.e., for steamship operations, including by necessary implication, the placing, retention, protection and removal of goods on the piers in connection with those operations.

Here the defendant got its goods onto the piers upon a representation that within a reasonable time they would be loaded on shipboard and removed in the ordinary course of business. The goods remained an excessively long time because of shipping difficulties, so long, indeed, that they interfered with the very uses which plaintiff was licensed by the city to make of the piers.

Both the placing of the goods on the piers in the first place, and their being left there an unreasonable length of time, were equally incidents to the shipping purposes of the plaintiff's business on the piers. It is not easy to find interdiction of public policy which will stand in the way of an entirely reasonable agreed price for such an interfering occupancy by the defendant of plaintiff's facilities, measured by the length of time of such occupancy; and no such specific interdiction lies in the statutes, the regulations, or the decisional law which has been brought to bear on the rights of wharf owners or their licensees.

The defendant's goods actually got on the plaintiff's piers in this manner: defendant's representative called plaintiff on January 8, 1959 and said defendant " wanted space on the dock " for plaintiff " to receive approximately 12,500 drums * * * of soybean oil, on a hold-on-dock basis " to go out on the steamship *Guadeloupe,* which was to sail within a month. Shortly after this the goods were placed on the docks, accompanied by dock receipts, some of which contained notations that the goods were " intended for the *S. S. Guadeloupe* or substitute ".

The oil did not go on that ship due to difficulties defendant had in completing arrangements contingent on certain aspects of a loan between Spain and the United States; a contingency of which plaintiff was not advised when defendant put the goods on the piers.

Before that ship sailed plaintiff's representative called defendant twice. He testified: " The idea of my call is to get the stuff off the dock so we could load it on the first available vessel, which was the *Guadeloupe.*" On January 24 defendant requested plaintiff to receive additional oil " for hold-on-dock for the Steamer *Covadonia,* which was scheduled for February ". Plaintiff accepted this additional oil, and it then had on hand a total of 5,696 tons of the oil which occupied all of Pier 15, half of Pier 16 and Pier 14, which plaintiff found necessary to sublease to receive the oil.

Arangements for the shipment of the oil were not made by defendant in February, and they were not made in March, and on March 25 plaintiff wrote defendant that unless the oil was released for shipment or removed from its piers by March 31 " a charge of $0.28 per ton per day will be applied against this merchandise for each and every day commencing the 1st day of April, that the material is on our piers ".

On April 28, in consideration of plaintiff's release of the oil defendant agreed to pay " all said charges just and properly due " but " without waiver of the right of the undersigned to

question the correctness of such charges ''. In the end the oil got off the piers on May 7 and May 12, about four months after the first of it was placed there, and the plaintiff's charges were $53,616.36.

If the plaintiff had any right to make an enforcible agreement with defendant for these charges there is adequate proof they are reasonable. No charge was made for the excessively long period between early January and April 1 when the oil overtaxed plaintiff's facilities. Late in March plaintiff was required to remove the oil which it had placed by arrangement with the lessee of Pier 14 and place it on the marginal street at a cost of 10 cents per ton per day payable to the city.

Plaintiff established that by this clogging of its facilities it lost business. It had been handling a vessel a week on an average at Pier 15 alone, and during this period it was required to refuse business for its piers and to arrange for vessels for which it acted as agent to use other piers. It established that its actual out-of-pocket expense for holding the oil on its piers and on the marginal street after April 1 was $33,940.11 and this amount did not include overhead or profit.

We see in all this no such clear condemnation of public policy as would interdict an agreement to pay plaintiff a fair amount in compensation for this excessive and unwarranted occupation of its facilities. The difference in legal theory between a failure to pay an agreed price for the occupancy, which in this case assumed something of the nature of an accord on a claim for damage after the event; and damage which would result from a breach of an express or implied condition that the occupancy would be reasonably related in time to the usual course of shipping, is not so great as to warrant, in any event, remission to be freshly litigated.

The judgment should be affirmed, with costs.

BREITEL, J. (dissenting). The principal question raised on this appeal is whether a shipping agent occupying two city-owned piers under revocable permits may exact a charge for the storage of goods upon the piers, such charges not being expressly authorized by statute, ordinance, or the permits.

Additional questions have been raised whether, in fact, an agreement providing for such charges was made between plaintiff (the shipping agent) and defendant, and whether the charges were reasonable. Because it is concluded that the shipping agent could not properly exact such storage charges by agreement or otherwise, the existence of an agreement and the reasonableness of the charges need not be considered. It may be, however, that plaintiff is entitled to damages for the

obstruction of the piers and for the expense of storing a portion of the goods on an adjoining marginal street.

The facts follow:

Plaintiff is the shipping agent for a number of steamship lines which pay it for obtaining cargos in New York City. In its business, plaintiff makes use of Piers 15 and 16, on the Manhattan side of the East River, where it provides "terminal services" consisting of receiving, storing, loading and unloading cargos.* The piers are city-owned and come under the jurisdiction of the city Department of Marine and Aviation. Plaintiff operates them under revocable permits which restrict the pier use to "the steamship operations" of certain named companies and any others which plaintiff may represent as agent. By the terms of the permits plaintiff is required to pay to the city an annual fixed charge and to maintain the piers in good repair. The permits are revocable upon 24 hours' notice. Although silent as to the right of plaintiff to exclude others, including the city, from using the piers for any purpose, the permits expressly provide that the city may enter upon the premises for inspection.

It does not appear that plaintiff constructed or improved the piers, and, indeed, the permits forbid additional construction without the consent of the city.

No express authority is granted in the permits to collect charges for the use of the piers. However, it is there provided that the city is to receive 50% of all "wharfage charges" for lighters, barges and other craft not owned or chartered, or engaged in the loading or unloading of vessels not owned or chartered, by plaintiff.

In January and February, 1958 plaintiff accepted from defendant for storage on the piers a total of 5,695 tons of soybean oil in drums on a "hold on dock" basis, with the understanding that although the oil had not yet been sold and was not scheduled for loading on a particular ship it would be released for shipment in "a month or so". It was apparently anticipated that the oil would eventually be shipped on vessels operated by the steamship lines which plaintiff represented and by which it would be compensated. Initially, no charge was discussed for the storage.

The expectations with respect to selling the oil, financing the sales, and arranging shipment were not realized as soon as

---

* The operation of the piers and the performance of the terminal services are actually carried out by a subsidiary, Pan-Atlantic Services Corporation, but, for the purposes of this appeal, plaintiff and Pan-Atlantic may be treated as one.

defendant anticipated. Indeed, and as a consequence, the oil remained on the piers during the latter half of February and all of March. Plaintiff inquired and pressed defendant on numerous occasions as to when shipment would be authorized. Finally, in the middle of March plaintiff announced it would begin charging for storage. On March 25, it notified defendant that a charge of 28 cents per ton per day would be imposed, beginning April 1, and that a charge of $3 per ton would be levied in case of removal of the oil from the piers.* Defendant objected to these charges but, in order to secure release of the oil for shipment without prepayment, it agreed to pay all charges "just and properly due". The oil was loaded and shipped in early May, and plaintiff thereupon demanded the sum of $59,864.88 (later reduced to $53,616.36) computed at the rate of 28 cents per ton per day, for which it brought this suit.

Prior to April 1, a portion of the oil was stored on the adjoining Pier 14 and on the marginal street or "farm" in front of Piers 15 and 16. For this, plaintiff paid a charge to the occupant of Pier 14 and to the city for use of the marginal street. After March 31, only Piers 15 and 16 and the marginal street were used for the storage.

The trial court, without a jury, held that the charges were lawfully assessed, there being no express prohibition against such charges either in the permits or in the rules and regulations applicable to the piers. Judgment was accordingly entered for the full amount claimed.

The legal principles applicable to wharves and to the charges which may be made for their use are of long standing. They are rooted in history and policy.

The right to impose storage charges, or "top wharfage", like the right to impose any charge for the use of a wharf, whether dockage, demurrage or storage, must have its source either in a grant or franchise from a public authority or in the ownership of land adjoining navigable waters (*Lansing* v. *Smith,* 4 Wend. 9, 21 [Ct. of Err. & App. *per* WALWORTH, Chancellor]; *Wiswall* v. *Hall,* 3 Paige Ch. 313, 318 [WALWORTH, Chancellor]; *Walsh* v. *New York Floating Dry Dock Co.,* 77 N. Y. 448, 452; *Flandreau* v. *Elsworth,* 151 N. Y. 473, 477; cf. *Langdon* v. *Mayor, etc., of City of N. Y.,* 93 N. Y. 129, 151–152; 94 C. J. S., Wharves, § 1, subd. f, § 12, subd. a; 40 Cyclopedia of Law and Pro., Wharves, pp. 904, 906, 909; Right to Wharfage, Ann. 70 L. R. A.

---

* For comparison, the old City Charter authorized a demurrage charge at the daily rate of 5 cents per ton. The rate for "public wharves" by promulgated schedule of the city Department of Marine and Aviation, since 1947, is at the daily rate of 10 cents per ton. See *infra.*

193, especially 195–196; Bouvier's Law Dictionary [Rawle's 3d rev.], Wharfage). But whatever the source of the right to wharfage, it is subject to governmental regulation, as affected with a public interest, particularly so with respect to wharves held out for general public use (*Marine Lighterage Corp.* v. *Luckenbach S. S. Co., Inc.,* 139 Misc. 612 [TOWNLEY, J.]; *The M. L. C. No. 10,* 10 F. 2d 699, 703–704, cert. denied 271 U. S. 675; *Lansing* v. *Smith, supra,* p. 23).

Indeed, in the *Marine Lighterage* case, Mr. Justice TOWNLEY, later a Justice of this court, stated succinctly the rules applicable to wharves. He said: " This defendant was entitled to the exclusive use of its wharf, and is to be deemed the owner of a private wharf. All wharves, whether public or private, are subject to State regulation in the matter of charges. At a public wharf only the fixed statutory charges are permitted. For use of a private wharf the statutory charges can be superseded by a specific bargain for a rate different from that prescribed by statute " (p. 612).

Thus, the issue in this case is converted into whether public-owned piers, although held by private permittees for specified private uses are, nevertheless, public piers for purposes of rate regulation and uses to which they may be put. If they are, then plaintiff is not entitled to recover as held by the trial court and as concluded by the majority of this court.

In determining the propriety of wharfage charges, a significant distinction has always been drawn between public and private wharves. For the use of public wharves, the rates imposed must be reasonable and only such as are authorized by statute (*Marine Lighterage Corp.* v. *Luckenbach S. S. Co., Inc., supra; Transportation Co.* v. *Parkersburg,* 107 U. S. 691, 699; 1 Farnham, Waters and Water Rights, 569–572, 578–582). On the other hand, wharfage rates for the use of private wharves may be fixed by agreement without regard to reasonableness or statutory regulations not expressly applicable to such wharves (*Woodruff* v. *Havemeyer,* 106 N. Y. 129, 135–136; *The M. L. C. No. 10,* 10 F. 2d 699, 704, *supra;* 94 C. J. S., Wharves, § 13, subd. b).

Whether a wharf is public or private is not always easy to determine. Even though privately owned, a wharf may nevertheless be considered public if it is impliedly held open for use by the public at large. A public wharf has been defined as one " to which the vessels and the public can resort, either at will or on assignment of a berth by a harbor authority." (*Kafline* v. *Brooklyn Eastern Dist. Term. Co.,* 180 App. Div. 858, 859; see, also, *The M. L. C. No. 10, supra,* p. 702.)

In *The M. L. C. No. 10* case Judge Hough expressed the critical test: "From these cases, and the reason of the matter, we infer and hold that the test of the privacy of a wharf is the right and power of the *private owner* to exclude the public from the use of what he owns; and, further, the right of exclusion implies, as usual, the right of selection   *   *   *" (p. 702; emphasis supplied).

On this test, in law and in reason, a public-owned pier, although held by a private operator under a publicly-granted permit, is not a private pier. Thus, in *Compton* v. *Hawkins* (90 Ala. 411, 414), it was said: "Whether a wharf or landing is public or private, depends upon the ownership of the soil, the purposes for which it was built, the authority by which it was erected, the uses to which it has been applied, and the nature and character of the structure. If the land on which it is constructed is vested in the public, or if built by public authority on land condemned, or if it be at the terminus of a public highway and practically forms a part thereof, or has been dedicated by the owner to the use of the public, it may be regarded as a public wharf or landing."

In *The Wharf Case* (3 Bland Chancery Rep. [Md.] 361, 374–375) the court stated: "Where an individual is the owner of any such wharf to which all persons may lawfully come for the purpose of lading or unlading their goods, he may be allowed by law to demand and receive certain specified and reasonable tolls for its use; because of his having expressly undertaken to be at all the charge of maintaining and repairing it. But in all cases, where the entire right of soil has been vested in the public, or where the wharf itself, or the place on which it has been built by public authority, has been condemned, or dedicated in any way to the use of the public, there no toll of any kind can be demanded; for, a toll is in the nature of a tax upon the people; and no tax of any description can be levied without the express sanction of the General Assembly."

Again, it was said (p. 374): "But it is otherwise of those wharves belonging to individuals, which have been legally thrown open to the use of the public, and also with regard to those which are entirely and properly public wharves. As to all such as belong to individuals, or a body politic, which are affected with a public interest, the wharfage must be reasonable; and, after having been once legally adjusted, cannot be enhanced to an immoderate amount."

Plaintiff, in this case, does not, of course, seek justification for its storage charges in any private riparian right or ownership of the wharves. Concededly, the piers are owned by the

City of New York. Thus, the only possible source of the claimed right to "top wharfage" is the permits granted by the city.

It is true that a grant or lease by a public authority may carry with it an implied right to collect wharfage (*The M. L. C. No. 10, supra*, p. 702; *Smith* v. *The Mayor*, 68 N. Y. 552, 557, involving still a third category, namely, privately constructed pier under permit on city-owned land; *Langdon* v. *Mayor, etc., of City of N. Y.*, 93 N. Y. 129, 152). But no such right to exact the charges claimed here may be implied from the mere revocable permits granted to plaintiff, which contemplate a limited use of the wharves solely for the steamship operations of the lines represented by plaintiff (cf. *Turner* v. *People's Ferry Co.*, 21 Fed. 90, 93–96).

The only provision in the permits which pertains to wharfage is that which reserves 50% of the charges imposed on certain lighters and barges to the city. Surely, an implication of additional rights to wharfage would be unwarranted in the face of this express provision, especially since the city's right to share in such wharfage would be left in considerable doubt.

Moreover, the pattern of regulations imposed upon all piers in the City of New York makes it quite plain that the right to exact the charges claimed by plaintiff was not contemplated as an incident to the privileges expressly granted by the permits. Thus, section 862 of the old Greater New York City Charter provided that it shall be lawful for " owners or lessees " of any pier, wharf or bulkhead to charge 5 cents per ton per day for goods left thereon after the expiration of 24 hours. Subdivision b of section 709b–1.0 of the present Administrative Code of the City of New York provides that any " person owning or having charge " of any wharf property who receives wharfage in excess of the rates fixed by the Commissioner of Marine and Aviation shall forfeit treble the amount charged to the person aggrieved. Whether plaintiff is an " owner or lessee " or " a person owning or having charge " of any wharf within the meaning of these provisions need not be determined. It is enough to find that such provisions clearly preclude an implied right, incident to the granting of the permits, to exact other or greater charges than are expressly authorized.

The question is properly raised, of course, whether the wharves which plaintiff occupies are not, in effect, used as private piers, and, if so, whether the city and the public have any interest in the rates imposed and the use made of the piers. But the answer is: these piers are indeed public piers and the public has a vital interest in their use and in the rates charged for any use.

In 1871, a comprehensive legislative plan was adopted for the development by the city of pier facilities along its entire waterfront (L. 1871, ch. 574). The plan replaced the prior scheme of development by private riparian owners and sought to meet the need for large-scale development of port facilities as aid to commercial shipping, upon which the city was increasingly dependent and from which it derived extensive revenues. No plan of development by private enterprise alone could have fulfilled the obvious need.

In effectuating the legislative plan, the city became the owner, by condemnation, of virtually the entire waterfront, and as the port business increased it became essential to assign permanent berths for the steamship lines regularly operating vessels in and out of the port. In so doing, the city unquestionably pursued a public purpose. As the court said in *Matter of Mayor, etc. of N. Y.* (135 N. Y. 253, 263), a case involving condemnation of waterfront lands to effectuate the comprehensive plan: "To minister to the necessities of commerce by providing fit and proper places in a seaport where ships can be loaded and unloaded with all proper facilities, is a public duty owing by the state and through it by the municipality which governs and controls the port. The only standard by which to judge of the extent of the duty consists in the necessities of the business. If a permanent pier and an exclusive right to its use be a necessity of those large steamship lines, without which business cannot be properly transacted, and in the absence of which the steamers will be sent across the river to New Jersey or to some other port, then the duty rests with the state or municipality to furnish such quarters for a fair compensation or else the state is bound to permit the steamship companies to obtain such accommodations from private owners. Having undertaken the duty imposed upon it by the state to provide such accommodations as the interests of commerce fairly require, all appropriate acts by the city done in the performance of that duty are for a public purpose."

As to the character of the use of piers assigned exclusively, under the leases, to certain steamship lines, the court concluded: "When used by lessees under the facts already stated, the use is a public one. The use is public while the property is thus leased, because it fills an undisputed necessity existing in regard to these common carriers by water, who are themselves engaged in fulfilling their obligations to the general public; obligations which could not otherwise be properly or effectually performed. And in filling the necessity for such accommodations, the city or the state is only performing its public duty" (p. 265).

For full discussion of the port development history, see, also, *Kingsland* v. *Mayor, etc. of N. Y.* (110 N. Y. 569); *Williams* v. *Mayor, etc. of N. Y.* (105 N. Y. 419); and *Langdon* v. *Mayor, etc. of N. Y.* (93 N. Y. 129, *supra*).

It is thus not to be doubted that the piers which plaintiff occupies are used for a public purpose. The interest of the city and of the public in general in insuring that the piers are not diverted to a purpose which would impede commercial shipping, or which does not promote commercial shipping, is not to be gainsaid. If unauthorized or exorbitant rates are charged by those in possession, the steamship lines, as well as the many enterprises dependent upon water transportation of cargos, are necessarily adversely affected. And to the extent that the piers are encumbered by the storage of goods for long periods, the total of accessible terminal facilities is diminished.*

The precise extent to which these piers may be considered public — whether open to general public use, assignable as berths by the harbor authorities for any vessels entering the port, or exclusively in the possession of plaintiff for limited purposes tending to facilitate and promote commercial shipping — is not presently of vital importance. What is important is that these piers, owned and constructed at public expense, be not diverted to private gain in a manner which is neither a proper incident to permissible use nor an efficient utilization of available facilities. Nor should this court lend its aid to the enforcement of private bargains, such as that here involved, which effectuate such a diversion.**

Consequently, in the absence of express authority, either in the permits or in the applicable statutes and regulations, for the storage charges claimed, and in the absence of private ownership of riparian rights or of the wharf facilities, plaintiff is without any right to exact the charges by agreement or otherwise. To permit such charges would encourage improper and

---

* The Rules and Regulations of the Department of Marine and Aviation provide, in this connection:

" 12. Time limit for goods on wharf property.

" a. Except when written permission is granted by the Commissioner of Marine and Aviation, the lessee or permittee of wharf property owned by The City of New York shall not allow goods, merchandise, cargo or material of any kind to remain at such property for a period longer than ten (10) days."

** A public pier, whether held under permit for public or private use, may be likened (as it has been in the materials cited) to a public street similarly licensed for a public use or a private use devoted to the public interest, such as a newsstand. Hence, one who converted a newsstand into a private locker service would hardly be entitled to recover on an agreement for rental of such a locker. Neither the use nor the rental agreement would be a " permitted use ".

unlawful use of the city's valuable waterfront properties and constitute an unwarranted burden upon commercial shipping.

As stated before, however, it may be that plaintiff is not wholly without recourse for the obstruction and incumbrance of the piers and the expense incurred in storing the oil on the marginal streets during the period beginning April 1, 1958, until the oil was removed. Other traffic, including the loading and unloading of vessels, as allowed by the permits, may have been necessarily diverted because of the presence of the large quantity of oil on the piers, and for the consequent loss plaintiff may be entitled to recovery (see *Walsh* v. *New York Floating Dry Dock Co.,* 77 N. Y. 448, 454–455, *supra*; *Camden & Amboy R. R. Co.* v. *Finch,* 5 Sandf. 48; *Russell* v. *The Empire State,* 21 Fed. Cas. 23, 27 [No. 12,145]).

Accordingly, I dissent and vote to reverse the judgment and dismiss the complaint with leave granted, however, to plaintiff, if it be so advised, to serve an amended complaint for damages and expenses incurred in the storage of the oil after April 1, 1958.

BOTEIN, P. J. and VALENTE, J., concur with BERGAN, J.; BREITEL, J., dissents and votes to reverse in opinion in which McNALLY, J., concurs.

Judgment affirmed, with costs to the respondent.